FILED
United States Court of Appeals
Tenth Circuit

September 17, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT
_____

JUDY K. KELLEY,

     Plaintiff - Appellee -
     Cross-Appellant,

v.

CITY OF ALBUQUERQUE, a
municipal corporation,

     Defendant - Appellant -
     Cross-Appellee,

   and

ROBERT M. WHITE; MARTIN J.
CHAVEZ,

     Defendants -
     Cross-Appellees.

No. 05-2309
No. 05-2317

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV-03-507 JB/ACT)**
_____

Daniel J. Macke (Kevin M. Brown with him on the briefs), Brown & German, Albuquerque, New Mexico, for Defendants - Appellants - Cross-Appellees.

Steven K. Sanders, Albuquerque, New Mexico, for Plaintiff - Appellee - Cross-Appellant.

_____

Before **KELLY**, **McCONNELL,** and **HOLMES**, Circuit Judges.
_____

**HOLMES**, Circuit Judge.
_____

The City of Albuquerque, Martin Chavez, and Robert White (collectively, the "City"), appeal a jury verdict finding that they retaliated against Plaintiff - Appellee Judy Kelley, formerly an Albuquerque assistant city attorney, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the New Mexico Human Rights Act ("NMHRA"), N.M. STAT. ANN. § 28-1-1 et seq. Ms. Kelley alleged that she was terminated in retaliation for representing Albuquerque in Equal Employment Opportunity Commission ("EEOC") proceedings against a client represented by Mr. Chavez prior to his 2001 election as Albuquerque's mayor. Once Mr. Chavez became mayor, Ms. Kelley was immediately terminated. The City appeals the district court's: (1) denial of its motions for summary judgment and judgment as a matter of law; and (2) alleged failure to properly instruct the jury.

Ms. Kelley filed a cross-appeal challenging the district court's grant of summary judgment to the City on her class-of-one Equal Protection claim. The court reasoned that she failed to introduce evidence demonstrating that other "similarly situated" individuals were treated differently than she was.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

2

# I. **BACKGROUND**

Ms. Kelley became an Albuquerque assistant city attorney in May 1985. Although another assistant city attorney interviewed her and selected her for the position, both the chief administrative officer and the city attorney approved the hire. In January 1998, Ms. Kelley was promoted to the position of deputy city attorney. For several years preceding her termination, Ms. Kelley reported to the city attorney, Mr. White.

Mr. Chavez was first elected Albuquerque's mayor in 1993. Rather than seeking re-election following his first four-year term, Mr. Chavez ran for New Mexico's governorship and was defeated. After his defeat, Mr. Chavez practiced law privately until he was re-elected Albuquerque's mayor in 2001.

In 2000, Ms. Kelley represented the City in two EEOC mediation sessions in which Mr. Chavez participated as opposing counsel. Following the first session, Ms. Kelley recommended that a private investigator be hired to investigate Mr. Chavez's client's allegations of discrimination. The investigator was unable to verify the allegations. Ms. Kelley testified that when she informed Mr. Chavez of the unfavorable results of the investigation during the second mediation session, he became hostile and admonished: "Ms. Kelley, don't call my client [by his first name] Steve. He's a City employee. He deserves your respect. I'll not have you patronizing my client by calling him Steve." Aplt. App. at 350. Later in the same mediation, Ms. Kelley referred to Mr. Chavez by his first name.

3

He responded by throwing his file on the table, demanding that Ms. Kelley address him as Mr. Chavez, and abruptly terminating the session. Ms. Kelley claimed that she was polite and conciliatory throughout the mediation, and she described the incident to Mr. White upon her return to the office.

At trial, Mr. Chavez related a different version of the same events. He testified that Ms. Kelley's tone throughout the second mediation was "demean[ing]" and infused with ethnic overtones to the point where he believed she was a "bigot." Aplt. App. at 781-82, 793. He felt Ms. Kelley had acted unprofessionally and unethically, although he did not report her to the state bar association or to her employer. Nor could Mr. Chavez identify the basis for his characterization of her behavior; he attributed his view to a "sixth sense." *Id.* at 784.

Ms. Kelley had no further contact with Mr. Chavez prior to his October 2001 election as mayor. In the summer of 2001, concerned that she would lose her job if Mr. Chavez was elected, Ms. Kelley requested a transfer to Albuquerque's human resources department to continue working in the Equal Employment Opportunity ("EEO") area. When she raised the idea of a transfer, Mr. White confirmed Ms. Kelley's fears stating, "if Marty is elected, you don't want to be here." Aplt. App. at 359. She received her transfer. Thus, before Mr. Chavez took office, Ms. Kelley and her staff moved out of the legal department and she began reporting to the human resources director. The chief

4

administrative officer confirmed Ms. Kelley's transfer to the position of "assistant city attorney, EEO Office," prior to Mr. Chavez's assumption of office. Aplee. Supp. App. at 2.

Before taking office on December 1, 2001, the newly-elected Mr. Chavez began a review of city departments. A transition team studying the city attorney's office recommended a fifteen-to-twenty-percent reduction of attorneys, the elimination of the position of deputy city attorney, and the reorganization of the management structure. The transition report stated that "morale among the attorneys and the staff" was "quite good." Aplt. App. at 877. Mr. Chavez ultimately decided to request letters of resignation from all unclassified[1] positions in the City, including all assistant city attorneys. Ms. Kelley submitted her letter of resignation on November 7, 2001, but included a request that Mr. Chavez not accept it and offered reasons why she should stay on in the EEO Office.

On November 30, 2001, Mr. Chavez informed Mr. White that he was going to accept Ms. Kelley's resignation. Mr. Chavez did not seek Mr. White's opinion about Ms. Kelley's job performance. However, when a law firm asked Mr. White's opinion about her capabilities at about that same time, Mr. White gave a

_____

[1] As an "unclassified" assistant city attorney, generally speaking, Ms. Kelley was "entitled to all of the rights and benefits to which classified employees are entitled except the benefits provided for in §§ 3-1-23, 3-1-24 and 3-1-25 [pertaining in part to the City's grievance procedures]." Aplee. Supp. App. at 12 (ALBUQUERQUE, N.M. CODE OF ORDINANCES [hereinafter "City Ordinance"] § 3-1-6(E)).

5

positive recommendation about her performance and demeanor. One week after his November 30, 2001, conversation with Mr. White, Mr. Chavez mentioned to Mr. White the second EEOC mediation that he had been involved in with Ms. Kelley.

Mr. Chavez accepted Ms. Kelley's resignation on December 3, 2001, effective January 1, 2002. He testified that he accepted the resignation because of a lack of productivity and low morale, as well as budgetary concerns. Approximately thirty-three assistant city attorneys worked for the City at the time of Ms. Kelley's termination. Although Mr. Chavez accepted approximately sixty percent of the requested letters of resignation, he accepted only two from employees paid from the city attorney's budget. Additionally, the City retained an assistant city attorney with an alcohol problem who had been involved in a sexual harassment claim.

As a result of her termination, Ms. Kelley filed a complaint against the City alleging race and sex discrimination, retaliation under Title VII and the NMHRA, and a violation of the Equal Protection Clause. Subsequently, the City filed a motion for summary judgment.

In a July 20, 2004, order ("Memorandum Order"), the district court granted the City judgment on some claims. In pertinent part, the district court held that Mr. Chavez and Mr. White were entitled to qualified immunity on Ms. Kelley's Equal Protection claim because she offered no evidence showing that she was

6

treated differently from other employees who were similarly situated. Additionally, the district court allowed Ms. Kelley's Title VII and NMHRA retaliation claims to proceed, finding: (1) her participation as a defense lawyer on Albuquerque's behalf in the 2000 EEOC mediations constituted "protected activity" under § 2000e-3(a) of Title VII and § 28-1-7(I) of the NMHRA; (2) she raised a genuine issue of material fact as to whether she was an "employee" under § 2000e(f) of Title VII; and (3) even if she was not an "employee" by virtue of the "personal staff" exemption to Title VII, she was nonetheless an employee under the NMHRA, which lacks a "personal staff" exemption.

The district court further concluded that Ms. Kelley provided sufficient evidence to establish a prima facie case of retaliation, emphasizing that she had introduced evidence of a causal relationship between the adverse employment action and her protected activity (i.e., the 2000 EEOC mediations). Finally, the district court determined that Ms. Kelley had introduced sufficient evidence of pretext to rebut the City's legitimate nondiscriminatory reason for the termination—which, at the time, was that Ms. Kelley did not meet Mr. Chavez's criteria for effective legal counsel for either himself or Albuquerque.

The parties proceeded to trial. At the close of the evidence, the City moved for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure

7

50(a),[2] on four grounds: (1) Ms. Kelley was not an "employee" under Title VII because she was a member of the mayor's "personal staff"; (2) she did not participate in a "protected activity" under Title VII or the NMHRA; (3) she failed to introduce sufficient evidence of an adverse employment action under Title VII or the NMHRA; and (4) she failed as a matter of law to establish a prima facie case of retaliation because she introduced insufficient evidence of a causal connection between her protected activity and her termination under Title VII or the NMHRA.

The district court denied the City's motion. First, the district court concluded that, from the evidence submitted, no reasonable jury could find that Ms. Kelley was covered by the "personal staff" exemption to the definition of "employee" under Title VII. Second, the district court found that Ms. Kelley's participation in the 2000 EEOC mediations as a defense attorney constituted "protected activity" under Title VII and the NMHRA. Finally, the district court decided that the question of whether Ms. Kelley satisfied the adverse-employment-action and the causation requirements for her Title VII and NMHRA claims should be submitted to the jury.

The jury found in Ms. Kelley's favor on both retaliation claims, awarding Ms. Kelley $372,975.90 in damages, including $172,974.90 in back pay, $200,000

---

[2]    The City also had asserted a Rule 50(a) motion on the same issues at the close of Ms. Kelley's case-in-chief.

8

for loss of future benefits, and $1 in nonpecuniary compensatory damages.

The City filed a post-trial Rule 50(b) motion or, in the alternative, a Rule 59 motion for a new trial on two of the four grounds raised in its Rule 50(a) motion: (1) that Ms. Kelley was exempt from Title VII's definition of employee pursuant to the personal staff exemption; and (2) that she did not participate in activities protected under either Title VII or the NMHRA.  *See* Dist. Ct. Doc. No. 91 (Memorandum in Support of Motion for Judgment as a Matter of Law, dated Jan. 17. 2005).[3]  In September 2005, the district court denied the City's motion. The City timely filed its notice of appeal, followed by Ms. Kelley's timely filing of her cross-appeal.

## II.  **DISCUSSION**

### A.  *The City's Appeal*

### 1. Denial of Motion for Judgment as a Matter of Law

The City argues that the district court erred in denying its motion for

---

[3]     The parties' appendices did not include this motion, the memorandum in support of the motion, or Ms. Kelley's response.  Nonetheless, the documents are properly part of the record on appeal because they were filed in the district court.  *See* Fed. R. App. P. 10(a)(1).  Accordingly, we refer to the relevant documents by their district court docket numbers.  *See Milligan-Hitt v. Bd. of Trs. of Sheridan County Sch. Dist. No. 2*, 523 F.3d 1219, 1231 (10th Cir. 2008) ("We sometimes refer to th[e] appendix colloquially as the record on appeal, but technically it is not. . . . [W]e retain the *authority* to go beyond the appendix if we wish . . . ."); *United States v. Williams*, 511 F.3d 1044, 1046 n.1 (10th Cir. 2007) ("Because the record provided by the parties did not include a number of relevant documents, we refer to the necessary documents by their district court docket number.").

9

judgment as a matter of law as Ms. Kelley was neither an employee as defined by Title VII nor did she participate in protected activity within the meaning of either Title VII or the NMHRA.

We review a district court's disposition of a motion for judgment as a matter of law de novo, "applying the same standard as the district court." *Harsco Corp. v. Renner*, 475 F.3d 1179, 1185 (10th Cir. 2007). Judgment as a matter of law is warranted "only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Id.* (citing *Vining ex rel Vining v. Enter. Fin. Group, Inc.*, 148 F.3d 1206, 1213 (10th Cir. 1998)). "[T]he controlling question is whether the plaintiff has arguably proven a legally sufficient claim." *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1241 (10th Cir. 2001). We view the evidence in the light most favorable to the nonmoving party. *Harsco Corp.*, 475 F.3d at 1185.

### a. Title VII's Definition of Employee

To bring an action in district court pursuant to Title VII, the plaintiff must show that she was an "employee." Title VII defines the term "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f). The statute provides four express exemptions to this definition:

> The term "employee" . . . shall not include [1] any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or [2] any person chosen by such officer to be on such officer's personal staff, or [3] an appointee on the policy making level or [4] an

10

immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision.

*Id.*[4] Pursuant to the plain language of the statute, the exemptions are distinct. *Rutland v. Moore*, 54 F.3d 226, 230 (5th Cir. 1995); c*f. Gregory v. Ashcroft*, 501 U.S. 452, 465-67 (1991) (treating exceptions to definition of "employee" in Age Discrimination in Employment Act ("ADEA") as distinct); *Nichols v. Hurley*, 921 F.2d 1101, 1108 (10th Cir. 1990) (noting that "four *separate* categories of people

---

[4] As part of the Civil Rights Act of 1991, Congress enacted the Government Employee Rights Act of 1991 (GERA). Civil Rights Act of 1991, 42 U.S.C. § 2000e-16a et seq. The GERA ameliorates the consequences to individuals of falling within certain of these exemptions. It confers Title VII rights on those individuals covered by exemptions 2, 3, and 4, but not on the elected official herself. *Id.* § 2000e-16c(a); *see* 1 Mark A. Rothstein, Charles B. Craver, Elinor P. Schroeder & Elaine W. Shoben, *Employment Law* § 2.5, at 177 (3d ed. 2004) (noting that the GERA "extended the coverage of the Act to all except elected officials"). Furthermore, "the procedures these employees must follow to obtain relief differ considerably from those ordinarily available under Title VII." 1 Lex K. Larson, *Employment Discrimination* § 4.06[1], at 4-32 (2d ed. 2008). The individual may file a discrimination claim with the EEOC, and if the EEOC determines that a violation has occurred, it may provide appropriate relief. 42 U.S.C. § 2000e-16c(b)(1). A party aggrieved by the EEOC's action may seek judicial review in the federal circuit courts. *Id.* § 2000e-16c(c); *see Employment Law*, *supra*, § 2.5, at 177 ("Review is to a federal court of appeals . . . . This provision is a dramatic departure from Title VII procedure, which provides for de novo review in a federal district court."); *Crain v. Butler*, 419 F. Supp. 2d 785, 788 (E.D.N.C. 2005) ("Because the GERA mandates that a plaintiff first seek administrative relief with the EEOC and then appeal any adverse administrative decision to the United States Court of Appeals, this court is without jurisdiction to hear [plaintiff's] retaliation claim if it is governed by the GERA rather than Title VII.").

are not covered by Title VII or the [Fair Labor Standards Act ("FLSA")]").[5]

Both here and before the district court, the City intermingled the four distinct exemptions, creating an overarching personal staff exemption.[6] At oral argument, however, the City conceded that it relied primarily on the immediate adviser exemption. Thus, we confine our analysis to that exemption.[7]

---

[5] The ADEA, 29 U.S.C. § 630(f), and the FLSA, 29 U.S.C. § 203(e), contain "essentially identical" language. *See Nichols*, 921 F.2d at 1103. Thus, courts construe the provisions in all three statutes harmoniously. *See id.*

[6] Such a broad-brush approach is regrettable because it impedes analytic clarity. However, apparently the tendency to conflate the four distinct exemptions into one "generic" personal staff exemption is not uncommon. *See Rutland*, 54 F.3d at 230 & n.7 (noting that defendant had relied on a "generic" personal staff exemption, which included an "immediate advisor" exemption, and that even courts "have failed, at times, to identify specifically" the exemption at issue and relied on a "generic" personal staff exemption).

[7] There are a number of similarities between the immediate adviser exemption and the personal staff exemption. As a consequence, on these facts, we would reach the same result after considering either exemption. The "personal staff" exemption removes from the reach of Title VII any person chosen by an elected official to be on such officer's personal staff. We evaluate the applicability of the "personal staff" exemption according to a nonexhaustive list of factors. *See, e.g.*, *Nichols*, 921 F.2d at 1110 (applying the factors to definition of "employee" under FLSA). Focusing on the nature of the relationship between the elected official and the plaintiff, the factors include:

> (1) whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual

(continued...)

12

The "immediate adviser" exemption prohibits Title VII claims by "an immediate adviser with respect to the exercise of the constitutional or legal powers of the [elected official's] office." 42 U.S.C. § 2000e(f). In enacting the exemptions to the definition of employee, the conference committee intended to:

> exempt elected officials and members of their personal staffs, and persons appointed by such elected officials as advisers or to policymaking positions at the highest levels of the departments or agencies of State or local governments, such as cabinet officers, and persons with comparable responsibilities at the local level. *It is the conferees['] intent that this exemption shall be construed narrowly*.

Joint Explanatory Statement of Managers at the Conference on H.R. 1746, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.C.C.A.N. 2179, 2180 (emphasis added).

---

[7](...continued)
intimacy of the working relationship between the elected official and the person filling the position.

*Id*. (quoting *Teneyuca v. Bexar County*, 767 F.2d 148, 151 (5th Cir. 1985)).

Although the set of factors is not identical and more limited, as will become evident *infra*, similar factors play a part in the analysis of whether the immediate adviser exemption applies. *See Rutland*, 54 F.3d at 231 ("Needless to say, whether an individual is on an elected official's 'personal staff' can be much more elusive than whether he is an immediate legal adviser to that official."). Even if we were to apply the personal staff exemption here, the record supports the district court's denial of the City's Rule 50 motions. For instance, assistant city attorneys are not appointed by the mayor, and they are at least principally accountable on a personal basis to the city attorney, not the mayor. Nor does the mayor exercise control over assistant city attorneys. Moreover, the position of assistant city attorney is low on the chain of command. Lastly, generally speaking, there is no actual intimacy in the working relationship between the mayor and assistant city attorneys. Accordingly, were we to rule on the applicability of the personal staff exemption, the outcome would be the same.

13

Therefore, Congress intended for the exemptions to be "construed narrowly" to cover only a relatively small set of individuals. *Owens v. Rush*, 654 F.2d 1370, 1375 (10th Cir. 1981); *see also Employment Discrimination*, *supra*, § 4.06[1], at 4-33 ("It was repeatedly stressed on the floor and in the committee rooms of Congress that this exemption was to be very narrowly construed.").

Factors relevant to the immediate adviser exemption include: (1) whether the elected official is charged with appointing or terminating individuals in the position; (2) whether the position reports to an intermediary appointee rather than directly to the elected official; and (3) whether the elected official exercises control over the independent judgment of one holding the position. *See Anderson v. City of Albuquerque*, 690 F.2d 796, 801 (10th Cir. 1982); *accord Rutland*, 54 F.3d at 231; *Marafino v. St. Louis County Circuit Court*, 537 F. Supp. 206, 211 (E.D. Mo. 1982), *aff'd*, 707 F.2d 1005 (8th Cir. 1983); *Gearhart v. Oregon*, 410 F. Supp. 597, 600-01 (D. Or. 1976); c*f. Goodwin v. Circuit Court of St. Louis County, Mo.*, 729 F.2d 541, 548 (8th Cir. 1984) (concluding that hearing officer not covered by immediate adviser exemption and noting "[t]he hearing-officer job itself required [plaintiff] to assert her independent judgment free from any direction from others"). This list of relevant factors, however, is not exhaustive.

We focus principally on the responsibilities and powers inherent in the position, rather than on the actions of specific individuals, including plaintiffs, who hold or have held the position. *See Anderson*, 690 F.2d at 800-01

14

(examining the "job description of the position" of staff director and noting that "*the position* does not fit into the narrow exemption intended by Congress" (emphasis added)); *accord Americanos v. Carter*, 74 F.3d 138, 141 & n.2 (7th Cir. 1996) ("examin[ing] the powers inherent in a given office, rather than the actual functions of the occupant of that office performed" and noting that such an approach is partly designed "to relieve courts of the burden of reevaluating the nature of a position every time a new administration changes the mix of responsibilities bestowed upon the officeholder" (internal quotation marks omitted)); *Rutland*, 54 F.3d at 232 ("[T]his evidence shows that, *as a special assistant attorney general*, Rutland would have served as an immediate adviser to the Attorney General with respect to the exercise of the constitutional or legal powers of the office." (emphasis added)); *Marafino,* 537 F. Supp. at 211 ("[I]t appears that *the position* of a staff attorney . . . vis-a-vis the Juvenile Court Judge, was more akin to that of 'just . . . a law clerk,' which the legislative history shows an intention to include within Title VII coverage." (emphasis added) (quoting *Gearhart*, 410 F. Supp. at 600-01)); c*f. Owens*, 654 F.2d at 1376-77 ("Considering *the nature of the Undersheriff's position* and the close working relationship required to perform effectively *in the position*, we must conclude that plaintiff was in *the type of job* which Congress intended to be within the personal staff exception . . . and thus outside Title VII coverage." (emphasis added)).

Accordingly, the fact that a particular occupant of a position has engaged in

15

certain conduct that suggests that the position is covered by an exemption does not necessarily mean that the position actually is one that warrants exemption coverage. *See Anderson*, 690 F.2d at 801 ("Application of the exemption cannot be supported by the trial court's finding that the staff director has occasionally advised the mayor on his constitutional and legal powers."). However, where it is not clear what responsibilities and powers are inherently the province of the position, we also analyze the actual functions of the typical occupant of the position. *Cf. Crumpacker v. Kan. Dep't of Human Res.*, 474 F.3d 747, 754 (10th Cir. 2007) (noting that statutory "uncertainty requires . . . an analysis of how the statute was actually implemented in this case," however, "where a state statute unambiguously and unqualifiedly vests the appointment power in a specific elected or non-elected official, we will not construe the statute to say otherwise").

Here, the district court not only denied the City's motion for judgment as a matter of law, but ultimately determined the employment-status issue in Ms. Kelley's favor as a matter of law. We agree with the district court's holding; a wealth of evidence at trial demonstrated the inapplicability of the immediate adviser exemption.

In *Anderson*, the City of Albuquerque argued that the position of staff director for the Albuquerque Human Rights Board was exempt from Title VII coverage as an immediate adviser to the mayor. 690 F.2d at 800-01. Relying first on Albuquerque's ordinances, we noted that the staff director served at the

16

direction of the chief administrative officer and the Board members, all of whom were mayoral appointees. *Id*. at 800. The chief administrative officer selected the staff director and subsequently sought the mayor's concurrence. *Id*. at 801. Additionally, the staff director's duties ordinarily did not involve formulating policy or advising the mayor. *Id*. Although the staff director advised the mayor on occasion, "[d]irect interaction between the mayor and the staff director [was] minimal." *Id*. Rather, the staff director dealt primarily with other appointees who directly advised the mayor. *Id*. Notwithstanding the fact-intensive nature of the exemption inquiry, we upheld the district court's judgment as a matter of law against the City, concluding that the staff director was not an immediate adviser.

As in *Anderson*, we turn first to Albuquerque's ordinances to examine the extent of the mayor's involvement with the hiring or appointment of individuals in Ms. Kelley's position. *See Anderson*, 690 F.2d at 801. Albuquerque's ordinances do not vest ultimate power to appoint assistant city attorneys in the mayor; they vest it in the chief administrative officer, who is appointed by the mayor. *See* Aplt. App. at 873 (City Ordinance § 3-1-6, stating that the unclassified position of assistant city attorney "serve[s] at the discretion of the Chief Administrative Officer"); Aplee. Supp. App. at 5 (CHARTER OF THE CITY OF ALBUQUERQUE [hereinafter "City Charter"], art. V, § 4(d), noting that the mayor is empowered to "hire or appoint" with the "advice and consent" of the city council, the city attorney and chief administrative officer), 10 (City Ordinance §

17

3-1-2, listing the responsibilities of the chief administrative officer, including the power to appoint or promote to an unclassified service position).

Mr. Chavez and Mr. White agreed that the mayor had minimal involvement with hiring assistant city attorneys. Ordinarily, a current assistant city attorney interviews and recommends candidates for assistant city attorney positions to the city attorney who actually makes the selection. Thus, the elected official—the mayor—does not personally select assistant city attorneys. Moreover, like the position of staff director in *Anderson*, the power to terminate those in the position of assistant city attorney does not lie with the mayor. *See* Aplee. Supp. App. at 7 (City Charter, art. X, § 2(b), stating the mayor may not hire or fire "any city employee except those personnel hired for unclassified positions directly responsible to the Mayor").

Furthermore, assistant city attorneys do not have a direct advisory relationship with the mayor. *See Anderson*, 690 F.2d at 801. The evidence supports the district court's conclusion that those in the position of assistant city attorney advise the city attorney who, in turn, advises the mayor. *See* Aplt. App. at 321, 327-28; Aplee. Supp. App. at 9 (City Ordinance § 2-7-2-2, indicating that the city attorney and his assistants represent the City in court but only the city attorney "advise[s] the Mayor and the Council as to legal matters"). Lastly, at least partly because of this lack of direct interaction with the mayor, there was no evidence that the mayor exercised control over the independent judgment of

18

assistant city attorneys. *Cf. Goodwin*, 729 F.2d at 548 (noting that hearing officer was not an immediate adviser, *inter alia*, because she had "very few personal contacts" with the defendant judge and made case-related recommendations to him of "a formal, detached nature").

The City notes that deputy city attorneys are empowered to act on behalf of the city attorney during emergencies, and at least one current deputy city attorney personally consults with the mayor on a consistent basis. Consequently, the City reasons that because Ms. Kelley held the position of deputy city attorney, a position ostensibly in an immediate advisory role to the mayor, she was exempt from Title VII's definition of "employee." We reject the City's contention.

In the first place, the record belies that Ms. Kelley was a deputy city attorney when Mr. Chavez assumed the mayorship. Rather, Ms. Kelley, formerly a deputy city attorney, had been transferred to the lesser position of "assistant city attorney" of the City's "EEO Office."[8] Aplee. Supp. App. at 2. Thus, even assuming that a deputy city attorney has a direct advisory role to the mayor, Ms.

---

[8] Indeed, Ms. Kelley has argued that she was not employed as an assistant city attorney at all, but rather an "EEO manager." Aplee. Br. at 16. The record evidence is decidedly to the contrary. The chief administrative officer transferred Ms. Kelley to the Human Resources Department in the position of "assistant city attorney, EEO office." Aplee. Supp. App. at 2. Furthermore, in her November 2001 letter tendering her resignation, Ms. Kelley referred to herself as an "Assistant City Attorney." Aplt. App. at 56. However, as noted herein, even as an assistant city attorney Ms. Kelley was not subject to the immediate adviser exemption.

19

Kelley did not hold that position when she was terminated. Moreover, the City's evidence is insufficient to support the broad claim that the position of deputy city attorney is actually any more an immediate adviser to the office of mayor than the assistant city attorney's position. That one of five current deputy city attorneys has frequent direct contact with the current mayor and has an attorney-client relationship with him is irrelevant to whether *the office* of deputy city attorney acts as an immediate adviser to *the office* of mayor.[9] *See Anderson*, 690 F.2d at 801 ("Application of the exemption cannot be supported by the trial court's finding that the staff director has occasionally advised the mayor on his constitutional and legal powers.").

Furthermore, the City argues that because assistant city attorneys represent the mayor in his individual capacity when he is sued within the scope of his duties as mayor, assistant city attorneys are immediate advisers to the mayor. The City, however, failed to identify evidence that would tend to show that such representation required assistant city attorneys to advise the mayor concerning the constitutional and legal powers of his office. We will not assume that this is so.

---

[9] For the same reasons, we are unwilling to assume that Mayor Chavez's stated practice of consulting personally with certain assistant city attorneys indicates that individuals holding that position are immediate advisers to the mayor. The record does not suggest that as a general matter Mr. Chavez consulted with assistant city attorneys concerning the constitutional and legal powers of his office. More importantly, it does not show that *the office of the mayor* customarily has used assistant city attorneys in this manner. *See Anderson*, 690 F.2d at 801.

*Cf.* Aplee. Supp. App. at 9 (City Ordinance § 2-7-2-2, drawing a distinction between providing representation in court, which the city attorney "shall" do personally and through his assistants, and "advis[ing] the Mayor . . . as to legal matters," which the city attorney only "shall" do personally).

Finally, the City attaches too much importance to our observation in *Anderson* that "the staff director is not required to have a law degree, and is not attached to the City's legal office." 690 F.2d at 801. We reasoned that the absence of these factors supported our conclusion that the staff director's position did not serve as an immediate adviser to the mayor regarding his constitutional and legal powers. However, it does not ineluctably follow that the presence of these factors indicates that assistant city attorneys are immediate advisers to the mayor. Although they were likely better situated by virtue of their education and experience than the staff directors in *Anderson* to serve the mayor in this role, the abundant evidence in the record indicates that doing so was not a function of the assistant city attorney's position.

Because the position of assistant city attorney does not act as an immediate adviser to the office of the mayor, Ms. Kelley was covered by Title VII's definition of employee.

### b. *Protected Activity*

The City argues that the district court erred in failing to grant judgment as a matter of law on Ms. Kelley's Title VII and NMHRA claims because her

21

participation as a defense attorney in an EEOC mediation does not qualify as "protected activity."  The City further argues that, even if such conduct qualifies as "protected activity" under Title VII, it does not qualify under the NMHRA.

### (1)  Title VII

Under Title VII it is "an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has made a charge, testified, assisted, or *participated in any manner* in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a) (emphasis added).  The "explicit language" of Title VII's "participation clause is expansive and seemingly contains no limitations." *Deravin v. Kerik*, 335 F.3d 195, 203 (2d Cir. 2003).

Courts have held that the "participation clause" protects an employee who: (1) defends himself against charges of discrimination, *id.* at 203, 205; (2) involuntarily participates as a witness in a Title VII proceeding, *see Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1186-89 (11th Cir. 1997); and (3) "actively participate[s]" in assisting a co-worker to assert her Title VII rights, *Eichman v. Ind. State Univ. Bd of Trs.*, 597 F.2d 1104, 1107 (7th Cir. 1979).

Although these cases are instructive, we reach a matter of first impression here: whether a defense attorney representing an alleged violator of discrimination laws during an EEOC mediation qualifies as a protected participant under the "participation clause" of § 2000e-3(a).

22

We begin, as we must, with the plain meaning of the statutory language. *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409 (1993). As the Supreme Court has recognized, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). When the statutory language is unambiguous, thus evincing a clear Congressional intent, the process of statutory construction ends, and the "judicial inquiry is complete." *Id*. at 254.

We conclude that the plain language of § 2000e-3(a) provides anti-retaliation protection for a defense attorney who represents an alleged violator of discrimination laws in an EEOC mediation. A defense attorney who later alleges retaliation by her employer is "*any* . . . employee[]." 42 U.S.C. § 2000e-3(a) (emphasis added). Additionally, the phrase "participated in *any* manner in . . . [a] proceeding," *id*. (emphasis added), covers the act of representing a client in an EEOC proceeding. The term "any" carries an expansive meaning when, as here, it is used without limitation. *United States v. Gonzales*, 520 U.S. 1, 5 (1997). When the term is given its natural effect in this statutory context it relates to all types of participation. *See Merritt*, 120 F.3d at 1186 ("Congress did not add any language limiting the breadth of that word, so 'any' means all." (some internal quotation marks omitted)). By representing the City in the 2000 EEOC mediation, therefore, Ms. Kelley "participated" in a proceeding under Title VII.

The City grants that the plain language of the participation clause naturally

23

may be read to encompass Ms. Kelley's participation in the 2000 EEOC

mediation proceedings with Mr. Chavez, but nonetheless contends that Title VII's

purpose—"protect[ing] access to the process whereby complaints of

discrimination are addressed"—is not served by extending the "participation

clause" to cover "acting as a defense attorney at an EEOC mediation."[10]  Aplt. Br.

at 16, 18.

Having determined that the statutory language unambiguously covers a

defense counsel's participation in an EEOC mediation, however, our first inquiry

---

[10]     The Eleventh Circuit's rejection of a similar argument in *Merritt* is
instructive:

> The gist of the district court's holding and Dillard's position
> goes beyond the question of assistance *per se*.  The underlying
> proposition is that no conduct qualifies for protection under
> the anti-retaliation provision unless it is done voluntarily for
> the purpose of assisting the claimant.  Congress could have
> crafted the statutory provision that way. But it did not.
> Congress said "testified" and "participated in any manner," not
> "voluntarily testified" and "voluntarily participated." There is
> no mention of motive in the statutory provision.  Courts have
> no authority to alter statutory language.  We cannot add to the
> terms of Title VII's anti-retaliation provision what Congress
> left out: the requirement of a good motive, a pure heart, a
> happy face.

120 F.3d at 1187.  Similarly, Congress could have qualified the statutory
language so that it offers protection only to participants—including
attorneys—that intentionally seek to advance the cause of alleged discrimination
victims, but it did not do so.  Furthermore, such an approach actually would be
contrary to the design of the statute, which has a distinct provision that provides
protection to those that "oppose" employer discriminatory conduct.  *See infra*
note 11.

24

is our last.  We are not at liberty to consider the perceived design "behind" the participation clause because "the actual design put forward through the language of the provision" is unambiguous.  *Merritt*, 120 F.3d at 1186 (refusing to look at Title VII's perceived design when "the actual design" was found in "the plain language of the provision").  Consequently, the City's attempt to rely on the legislative and "social" history of the provision—as reflected in the analytic approach of *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581 (2004), and *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997)—is unpersuasive.  Those cases, unlike this one, involved ambiguous statutory provisions, thus allowing the Court to delve into the social history undergirding those provisions.  *See, e.g., Cline*, 540 U.S. at 586-90 (resorting to legislative and social history to interpret "age" in § 623(a)(1) of ADEA due to ambiguity of term); *Robinson*, 519 U.S. at 341, 345-46 (after determining the term was ambiguous, considering the purpose of the statute in interpreting term "employees" in § 2000e-3(a) of Title VII to cover former employees).

Nonetheless, the City invokes the rarely-successful absurd results doctrine.  *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 459 (2002) ("[T]he Court rarely invokes [the absurd results] test to override unambiguous legislation.").  That doctrine nullifies the plain meaning of a statute when adherence to the language yields an absurd outcome.  *Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006) (en banc).  The City contends that following the literal language of the

25

statute yields the absurd result of protecting all participants, even though the goal

of "[m]aintaining unfettered access to statutory remedial mechanisms," *Robinson*,

519 U.S. at 346, would not be furthered by protecting some in the participant

group, including defense attorneys.

We conclude that the City has failed to overcome the "formidable hurdle"

necessary to successfully invoke the absurd results doctrine. *See Robbins*, 435

F.3d at 1241 (stating the court "can apply the doctrine only when it would have

been unthinkable for Congress to have intended the result commanded by the

words of the statute"). First of all, even if the City were correct in contending

that the natural reading of the statute would cause it to be over-inclusive in its

protective sweep, that would hardly render the effect of the statute absurd—that

is, "'so gross as to shock the general moral or common sense.'"[11] *United States v.*

---

[11] In *Twisdale v. Snow*, 325 F.3d 950 (7th Cir. 2003), the court refused to extend Title VII's protection to Mr. Twisdale who, as chief of the Internal Revenue Service's Quality Measurement Branch, participated in an EEOC investigation but opposed the claimant's position. The court acknowledged that, "[r]ead literally," § 2000e-3(a) protected Mr. Twisdale. 325 F.3d at 952. However, the court determined that "everyone concerned in the administration of Title VII and cognate federal antidiscrimination statutes had *assumed* that the retaliation provision was for the protection of the discriminated against, and not their opponents." *Id.* (emphasis added). Essentially, the court interpreted the statute as imposing a requirement that a participant in an EEOC proceeding also oppose the discriminatory employment practice to receive protection from retaliation. *Id.* at 952-53. We decline to apply *Twisdale* here, *inter alia*, because it impermissibly collapses the opposition and participation clauses of the statute. As one court noted:

(continued...)

26

*Newsome*, 898 F.2d 119, 121 n.3 (10th Cir. 1990) (quoting *Crooks v. Harrelson*, 282 U.S. 55, 60 (1930)). Congress could have rationally concluded that some over-inclusivity was a cost that it was willing to bear to ensure that no participant that it intended to protect was inadvertently omitted from the statute's coverage. *Cf. Weinberger v. Salfi*, 422 U.S. 749, 777 (1975) ("[T]he question raised is not whether a statutory provision precisely filters out those, and only those, who are in the factual position which generated the congressional concern reflected in the statute. Such a rule would ban all prophylactic provisions, and would be directly contrary to [the Court's prior precedent].").

Moreover, including defense counsel within the ambit of the statute actually promotes its objectives. Congress's studied use of all-embracing language signals its intent to address more than the limited objective of

---

[11](...continued)
> The distinction between participation clause protection and opposition clause protection is significant because the scope of protection is different. Activities under the participation clause are essential to the machinery set up by Title VII. As such, the scope of protection for activity falling under the participation clause is broader than for activity falling under the opposition clause.

*Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 n. 4 (4th Cir. 1998) (citations and internal quotation marks omitted); *see Vaughn v. Epworth Villa*, No. 07-6005, __ F.3d __, 2008 WL 3843340, at *4 (10th Cir. Aug. 19, 2008) ("interpret[ing] the scope of the participation clause vis-à-vis the opposition clause" and concluding that the participation clause is broader). Therefore, requiring that the participant in an EEOC proceeding also oppose a retaliatory employment practice runs counter to the statutory scheme.

27

facilitating the reporting of discrimination by employees.  Instead, Congress was also concerned with ensuring the "overall integrity of the administrative process." *Deravin*, 335 F.3d at 204.  Protecting attorneys who afford representation to all parties in EEOC proceedings from subsequent adverse employment actions motivated by their participation serves this objective.  Failing to shield such activity could chill the likelihood—and quality—of representation during such proceedings thus, in turn, impacting the fairness of the proceedings, the openness of the litigation, and the possibility of settlement.  The City offers no cogent rationale for why this result fails to further the process-oriented goals of Title VII.  *See Barnhart*, 534 U.S. at 462 (refusing to alter unambiguous text to satisfy the policy preferences of a party).

Because the statute's plain language embraces a defense attorney's participation in an EEOC mediation, we conclude that Ms. Kelley engaged in protected activity pursuant to Title VII.[12]

---

[12]  Whether Ms. Kelley's participation in the EEOC mediation is protected activity under Title VII is a distinct question from whether Mr. Chavez retaliated against Ms. Kelley because of her protected activity.  *See Vaughn*, 2008 WL 3843340, at \*4-6 (concluding that plaintiff's activities constituted "participation in" a Title VII proceeding but that her use of unredacted patient medical records in the course of the proceeding was the reason for her termination); *cf. Robbins v. Jefferson County Sch. Dist. R-1,* 186 F.3d 1253, 1260 (10th Cir. 1999) (holding that a plaintiff's activities in the protected context of pursuing a grievance were "not reasonable and did not constitute protected opposition" and could permissibly form the basis for adverse employer action), *abrogated on other grounds*, *Nat'l R. R. Passenger Corp. v. Morgan*, 536 U.S.

(continued...)

28

## (2)  NMHRA

The City argues that Ms. Kelley did not engage in protected activity pursuant to the NMHRA both because the statute does not contemplate protection for a defense counsel's participation and because the term "proceeding" under § 28-1-7(I) of the NMHRA does not cover EEOC proceedings.

We do not find the first argument convincing.  "In interpreting [the New Mexico] Human Rights Act, [the New Mexico Supreme Court has] previously indicated that it is appropriate to rely upon federal civil rights adjudication for guidance . . . ."  *Gonzales v. N.M. Dep't of Health*, 11 P.3d 550, 557 (N.M. 2000). Similar to Title VII, the NMHRA covers "participat[ion] in *any* proceeding" under the NMHRA.  N.M. STAT. ANN. § 28-1-7(I)(2) (emphasis added).[13]  Like §

---

[12](...continued)
101, 116 (2002).  The City does not defend on the ground that it was some impropriety in Ms. Kelley's conduct during the EEOC mediation, rather than her participation per se, that was the reason for her termination, and we therefore need not consider that argument.  In this section, we decide only the question of whether a defense attorney's representation in an EEOC proceeding qualifies as protected activity under Title VII.

[13]     The statute states in pertinent part:

It is an unlawful discriminatory practice for:

>     I. any person or employer to:
>         . . . .
>     (2) engage in any form of threats, reprisal or discrimination against any person who has opposed any unlawful discriminatory practice or has filed a complaint, testified or participated in any proceeding

(continued...)

29

2000e(f) of Title VII, the plain language of § 28-1-7 is broad enough to provide protection to a defense attorney participating in a mediation. For the same reasons offered in our analysis of Title VII, therefore, we conclude that NMHRA's retaliation provisions extend to Ms. Kelley under the facts of this case.

We reject the City's second argument as well. Our review of the record reveals that the City failed to raise the argument to the district court. "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976); *see also Wilburn v. Mid-S. Health Dev., Inc.*, 343 F.3d 1274, 1280 (10th Cir. 2003). Accordingly, the argument is not properly before us, and we will not consider it.

### c. Causation

The City contends that Ms. Kelley failed to establish a prima facie case of retaliation because the evidence is insufficient to show a causal connection between Ms. Kelley's participation in the EEOC proceedings and her termination. The City raised the causation issue in its Rule 50(a) motion to the district court, both at the close of Ms. Kelley's case-in-chief and at the close of all of the evidence. However, the City did *not* include the issue in its post-verdict Rule 50(b)/Rule 59 motion. *See* Dist. Ct. Doc. No. 91. We conclude that this failure

---

[13](...continued)
          under the Human Rights Act . . . .

N.M. STAT. ANN. § 28-1-7(I)(2).

30

forecloses the City's challenge on appeal to the sufficiency of the evidence.

The Supreme Court has declared that a "failure to comply with Rule 50(b) forecloses [a party's] challenge to the sufficiency of the evidence." *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404, 407 (2006).[14]  "[T]he precise subject matter of a party's Rule 50(a) motion—namely, its entitlement to judgment as a matter of law—cannot be appealed unless that motion is renewed pursuant to Rule 50(b)." *Id.* at 404.

In *Unitherm*, the Court reasoned that district court's denial of a Rule 50(a) motion "cannot form the basis of . . . [an] appeal, because the denial of that motion [is] not error." *Id.* at 406.  More specifically, the denial does not decide anything; it just puts off resolution of the sufficiency-of-the-evidence question until after the verdict. *Id.* at 405-06; *see* Fed. R. Civ. P. 50(b) ("If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury *subject to the court's*

---

[14]  In *Unitherm*, the Court applied its rule retroactively despite the parties' reliance on then-extant Tenth Circuit law which did not require the filing of a Rule 50(b) motion to preserve a sufficiency challenge.  546 U.S. at 406 n.6 ("[W]e reject [respondent's] contention that our application of Rule 50(b) to the instant case is impermissibly retroactive.").  Thus, we must apply *Unitherm* here, though the verdict predated publication of the *Unitherm* opinion. *E.g.*, *Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007) (applying *Unitherm*, even though it was decided after the verdict, because courts of appeals are required "to treat the rule as generally retroactive, applying it 'to all pending cases, whether or not those cases involve predecision events.'" (quoting *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 752 (1995))).

31

*later deciding the legal questions raised by the motion*." (emphasis added)).

Thus, the City's failure to file a Rule 50(b) motion forecloses its appellate

challenge on the causation issue.[15]  *See Unitherm*, 546 U.S. at 406.

---

[15]      *Unitherm* stressed the mandatory nature of Rule 50(b) by repeatedly warning that a party's failure to file a Rule 50(b) motion left the appellate courts "powerless" to enter judgment in its favor.  *See, e.g.*, 546 U.S. at 405.  At least one of our sister circuits has read this strong language regarding power as indicating that the a party's failure to file a Rule 50(b) motion deprives an appellate court of subject matter jurisdiction to review the sufficiency of the evidence.  *See Allison v. City of E. Lansing*, 484 F.3d 874, 876 (6th Cir. 2007) ("Given *Unitherm Food*'s holding, it is now clear that renewing the motion post-verdict is jurisdictional and cannot be waived.").  The Sixth Circuit's view is open to question because of the Supreme Court's subsequent decision in *Bowles v. Russell*, 551 U.S. __, 127 S. Ct. 2360, 2365 (2007).  The Court in *Bowles* concluded that Federal Rule of Appellate Procedure 4(a) is jurisdictional because it implements 28 U.S.C. § 2107. *Id.* at 2365-66.  We have interpreted *Bowles* to mean that *only* rules that implement statutory limits can be jurisdictional.  *United States v. Mitchell*, 518 F.3d 740, 744 (10th Cir. 2008) ("*Bowles* . . . clarified that court-issued federal procedural rules not derived from statutes are not jurisdictional, but rather inflexible claim-processing rules."); *United States v. Garduño*, 506 F.3d 1287, 1290 (10th Cir. 2007) ("In *Bowles v. Russell*, the Supreme Court further clarified that whether a procedural rule's time limitations are claim-processing or jurisdictional hinges on whether the rule is grounded in a statute."); *accord Metro. Life Ins. Co. v. Price*, 501 F.3d 271, 278 (3d Cir. 2007) ("True 'jurisdictional' limitations are set by the Constitution and by Congress, not by rules of procedure or judge-made doctrine.").  Rule 50(b) is not grounded in a statute.  Accordingly, in a jurisdictional inquiry relating to it, the principles of *Bowles* would seemingly be implicated.  However, we need not definitively decide this jurisdictional question—a matter of first impression—here.  Therefore, we do not do so.  Although "a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction," the Supreme Court has recognized that "jurisdiction is vital only if the court proposes to issue a judgment on the merits." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 127 S. Ct. 1184, 1191-92 (2007) (alteration and internal quotation marks omitted) (quoting *Intec USA, LLC v. Engle*, 467 F.3d 1038, 1041 (7th Cir. 2006)).  "[A] federal court has leeway to choose among threshold grounds for denying audience to a

(continued...)

## 2. Jury Instructions

We review a district court's refusal to give a requested instruction for an abuse of discretion. *See United States v. Gonzales*, 456 F.3d 1178, 1181 (10th Cir. 2006). In determining whether the district court properly exercised its discretion, "we review the instructions *de novo* to determine whether, taken as a whole, they accurately state the governing law." *Id.* It is axiomatic that "only where there is sufficient evidence to support an issue or theory is the party offering an instruction entitled to have the instruction given." *Brownlow v. Aman*, 740 F.2d 1476, 1490 (10th Cir. 1984).

---

[15](...continued)
case on the merits." *Id.* at 1191 (internal quotation marks omitted) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999)); *see Arar v. Ashcroft*, 532 F.3d 157, 172 (2d Cir. 2008). In denying the City an audience on its causation challenge under the rationale of *Unitherm*, we need not rule on the merits. Furthermore, we find additional support for a *Unitherm*-based resolution in our observation that employing *Unitherm* arguably is a "less burdensome course" than resolving the first-impression jurisdictional question, especially if that resolution potentially would cause us to part company with the Sixth Circuit. *See Sinochem*, 127 S. Ct. at 1194 (noting in support of the conclusion that resolving the case under the non-merits *forum non conveniens* doctrine was the "less burdensome course" that "subject-matter jurisdiction presented an issue of first impression"); *cf. Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 525 (5th Cir. 2008) (finding it inappropriate to exercise its leeway under *Sinochem* to sidestep the jurisdictional issue in favor of a res judicata, non-merits disposition, in part because the court would have to "face an apparent circuit split"), *petition for cert. filed*, (U.S. Aug. 25, 2008) (No. 08-252). Accordingly, we need not (and do not) decide here whether a party's failure to file a Rule 50(b) motion deprives us of jurisdiction over its sufficiency-of-the-evidence challenge.

33

### a. Title VII's Definition of Employee

As we previously determined, not only was there no error in the district court's denial of the City's Rule 50(a) motion predicated on the ground that Ms. Kelley was not an employee protected by Title VII, but the evidence was unequivocal that Ms. Kelley was in fact a statutory employee. Because no reasonable jury could find from the evidence that Ms. Kelley qualified for an exemption from the definition of "employee," we conclude that the district court properly refused to submit to the jury the question of whether she was an "employee" under Title VII.

### b. Temporal Proximity

The City further claims that the district court erred in refusing to give its proposed instruction on the necessary causal connection between Ms. Kelley's protected activity and her termination.[16] Because the City makes only conclusory

---

[16] The City also claims for the first time in its reply brief that the district court treated the case as a mixed motive retaliation case, as opposed to a pretext retaliation case in instructing the jury. A "mixed-motive" instruction is appropriate only in cases where direct evidence suggests forbidden animus was a motivating factor in the employment decision. *Medlock v. Ortho BioTech, Inc.*, 164 F.3d 545, 552-53 (10th Cir. 1999). The City implies that by treating this case as a "mixed motive" case, the district court lessened Ms. Kelley's burden of proof. *See Septimus v. Univ. of Houston*, 399 F.3d 601, 607-08 (5th Cir. 2005) (finding plain error when district court instructed jury under "mixed-motive" analysis in "circumstantial evidence 'pretext' case" because "motivating factor" test is "less stringent" measure of causation than "but for" test in pretext analysis). However, the City failed to raise this challenge in its opening brief. Furthermore, in its reply brief, it does not appropriately analyze the alleged

(continued...)

34

allegations of error, we cannot consider its argument on appeal.

To preserve objections to jury instructions, a party must submit a proposed instruction, Fed. R. Civ. P. 51(a)(1), and must timely object to the district court's refusal to give its proposed instruction "on the record, stating distinctly the matter objected to and the grounds for the objection." *Id*. at 51(c). Here, the City preserved potential instructional error for appeal. However, the City's identification of error in their briefing before us is, at best, "perfunctory" and "fail[s] to frame and develop an issue sufficient to invoke appellate review." *Murrell v. Shalala*, 43 F.3d 1388, 1390 n.2 (10th Cir. 1994). The City offers no argument or authorities in support of its position that the district court erred in refusing its instruction. Absent, for instance, is a discussion of (1) whether the proposed instruction was a proper exposition of Tenth Circuit law,[17] *see McInnis*

---

[16](...continued)
erroneous instructions or discuss why a "mixed motive" instruction was improper based upon the evidence presented at trial. We, therefore, consider this argument forfeited. *See Anderson v. U.S. Dep't of Labor*, 422 F.3d 1155, 1174 (10th Cir. 2005) ("[A]ppellate courts will not entertain issues raised for the first time on appeal in an appellant's reply [brief]." (second alteration in original) (internal quotation marks omitted)).

[17]     We question, but do not decide here, whether the law required the district court to give the requested instruction. Although unpublished, *EEOC v. Loral Aerospace Corp.*, No. 97-2333, 1998 WL 769820 (10th Cir. Oct. 29, 1998), offers persuasive insight. There, the plaintiff appealed the district court's "refusal to give a stipulated instruction stating that a causal connection may be inferred from protected opposition to discrimination closely followed by adverse employment action." *Id.* at *1. We found no error in refusing to give this instruction reasoning that a judge need not deliver instructions on all valid legal

(continued...)

*v. Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1141 (10th Cir. 2006); (2) whether the jury instructions, as a whole, properly guided the jury, *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1093 (10th Cir. 2007); or (3) whether the City was prejudiced by the district court's refusal to give the instruction, *id.* "We will not review an issue in the absence of reasoned arguments advanced by the appellant as to the grounds for its appeal." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1031 (10th Cir. 2007).

### 3.  Denial of Motion for Summary Judgment

The City also asserts that the district court erred in denying its motion for summary judgment.  We review the denial of a motion for summary judgment de

---

[17](...continued)

principles, particularly where an inference is permissible but not mandatory and when counsel is free to argue such an inference to the jury.  *Id.*  We further noted that instructions allowing the use of circumstantial evidence to establish discriminatory motive "stated the applicable law and provided a proper understanding of the issues." *Id.*

In light of the City's failure to point to any case law holding that the giving of an instruction on "temporal proximity"—one of several ways of proving or disproving causation—is mandatory, *Loral Aerospace* is persuasive. *See also Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir. 1994) (finding in Title VII context that judge need not deliver instructions concerning "permissible" inferences, as judge "may and usually should leave the subject to the argument of counsel").  Like the jury instructions at issue in *Loral Aerospace*, the instructions in this case allowed the jury to consider circumstantial evidence, required Ms. Kelley to prove that the City retaliated against her *because* of her participation in the EEOC mediation, and directed it to draw "reasonable inferences" from the testimony and exhibits.  The City remained free to argue that the timing of the claimed adverse employment action created an inference against causation.

novo and apply the same standards as the district court. *Yaffe Cos. v. Great Am. Ins. Co.*, 499 F.3d 1182, 1185 (10th Cir. 2007). "Summary judgment is appropriate if 'there is no genuine issue as to any material fact and . . . the [movant] is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)). Our review, however, is only appropriate where the motion for summary judgment presented a legal question. *See Ruyle v. Cont'l Oil Co.*, 44 F.3d 837, 842 (10th Cir. 1994); *Grubb v. FDIC*, 868 F.2d 1151, 1160-61 (10th Cir. 1989); *see also Wilson v. Union Pac. R.R.*, 56 F.3d 1226, 1229 (10th Cir. 1995) ("Where a motion for summary judgment based on an issue of law is denied, appellate review of the motion is proper even if the case proceeds to trial and the moving party fails to make a subsequent Rule 50 motion.").

We cannot review the denial of a motion for summary judgment when that motion raises a claim of sufficiency of the evidence. *See Ruyle*, 44 F.3d at 842. When the motion involved a question of the sufficiency of the evidence, "[s]ummary judgment ends at trial." *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1103 (10th Cir. 1998). "[E]ven if summary judgment was erroneously denied, the proper redress would not be through appeal of that denial but through subsequent motions for judgment as a matter of law . . . and appellate review of those motions if they were denied." *Whalen v. Unit Rig, Inc.*, 974 F.2d 1248, 1251 (10th Cir. 1992).

37

### a. Title VII's Definition of Employee

The City's motion for summary judgment challenged the sufficiency of the evidence demonstrating that Ms. Kelley was an employee for purposes of Title VII. The district court concluded: "Kelley presents sufficient evidence to create a genuine issue of material fact that the assistant city attorney position is not the 'highly intimate and sensitive position[] of responsibility on the staff of the elected official' that Congress contemplated when it created the personal staff exemption under § 2000e(f)." Aplt. App. at 243 (quoting *Owens*, 654 F.2d at 1375). The City did not seek "proper redress" of this evidentiary decision through its motions for judgment as a matter of law. *See Whalen*, 974 F.2d at 1251. Accordingly, the City has forfeited its sufficiency-of-the-evidence challenge to Ms. Kelley's employee status.

### b. Title VII's Definition of Protected Activity

The City's motion for summary judgment presented the pure legal question of whether acting as a defense attorney is protected activity under Title VII. Accordingly, we can review the denial of the motion for summary judgment on this issue. *See Ruyle*, 44 F.3d at 842. However, as we previously have determined, Title VII's definition of protected activity includes acting as a defense attorney in an EEOC proceeding. Because the City was not entitled to judgment as a matter of law on this issue, we find that the district court's denial of its motion for summary judgment regarding the same subject matter was

38

correct.

## 4. Conclusion

Because we determine that the district court did not err in denying either the City's Rule 50 or summary judgment motion or in instructing the jury, we affirm the judgment for Ms. Kelley on her retaliation claims pursuant to both Title VII and the NMHRA.

### *B. Ms. Kelley's Cross-Appeal*

Ms. Kelley's cross-appeal raises only one issue: whether the district court properly held that Mr. Chavez and Mr. White were entitled to qualified immunity because Ms. Kelley failed to establish that the City violated the Equal Protection Clause. Reviewing Ms. Kelley's challenge to the grant of summary judgment based upon qualified immunity de novo, *see Arredondo v. Locklear*, 462 F.3d 1292, 1297 (10th Cir. 2006), we affirm, although on different grounds than those relied on by the district court.

The district court found that Mr. Chavez and Mr. White were entitled to qualified immunity on Ms. Kelley's Equal Protection claim because she failed to present evidence "providing the necessary detail on other employees to establish they are similarly situated to Kelley." Aplt. App. at 238. As such, the district court concluded she could not establish an essential prerequisite of her class-of-one claim: that she was treated differently than others in a similar position and that there was no rational basis for this difference in treatment. In other words,

39

she failed to prove a constitutional violation, which she was required to do when the City raised a qualified immunity defense. *See, e.g.*, *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (stating that when a defendant raises a qualified immunity defense, the court must first determine whether the facts in the light most favorable to the plaintiff demonstrate the violation of a constitutional right and then, only if they do show such a violation, whether that right was clearly established).

Although we agree with the district court that Ms. Kelley did not prove a constitutional violation, we reach that conclusion for different reasons. There is a fundamental problem with Ms. Kelley's claim: the class-of-one theory is not legally cognizable where, as here, a public employee claims that she has been treated differently than other employees. The Supreme Court has "never found the Equal Protection Clause implicated in the specific circumstance where, as here, government employers are alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary or irrational manner." *Engquist v. Or. Dep't of Agric.*, 128 S. Ct. 2146, 2155 (2008). And, more to the point, the Court recently held that "the class-of-one theory of equal protection does not apply in the public employment context."[18] *Id.* at 2151.

---

[18] The district court of course did not have the benefit of *Engquist*, which was decided on June 9, 2008, in addressing Ms. Kelley's equal protection claim.

40

Given the Supreme Court's recent holding, we need not address Ms. Kelley's argument that she raised a genuine issue of fact by showing that she was the only non-department head attorney fired by Mr. Chavez and was the only attorney known to have had a case against him. Ms. Kelley's entire class-of-one claim is foreclosed by the Court's decision in *Engquist*. *See Pignanelli v. Pueblo Sch. Dist. No. 60*, No. 07-1251, __ F.3d__, 2008 WL 4149656, at *6 (10th Cir. Sept.10, 2008) (noting that *Engquist* bars public employee plaintiff's equal protection claim as it "unequivocally h[eld] that the class-of-one equal protection theory, whatever its contours, 'does not apply in the public employment context'" (quoting *Engquist*, 128 S. Ct. at 2151)); *Appel v. Spiridon*, 531 F.3d 138, 141 (2d Cir. 2008) (per curiam) ("Recently, the Supreme Court held that the Equal Protection Clause does not apply to a public employee asserting a violation of the Clause under a 'class of one' theory. As this theory served as the only basis for the equal protection analysis underlying the District Court's grant of a preliminary injunction in favor of Appel, we reverse the order of the District Court." (citation omitted)).

Because Ms. Kelley did not have a legally cognizable class-of-one claim, she could not demonstrate a constitutional violation. Thus, summary judgment was properly granted in favor of Mr. Chavez and Mr. White.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment.

41