**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 3, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ISABELLE DerKEVORKIAN,

    Plaintiff - Appellee /
    Cross - Appellant,

v.

LIONBRIDGE TECHNOLOGIES,
INC., dba LIONBRIDGE US, INC.,

    Defendant - Appellant,
    Cross - Appellee,

and

SHARRYN E. ROSS and ROSS,
MARTEL & SILVERMAN, LLP,

    Defendants /
    Cross - Appellees.

Nos. 07-1125
and 07-1149

(D. Colorado)

(D.C. No. 04-cv-01160-LTB-CBS)

---

**ORDER AND JUDGMENT**[*]

---

Before **LUCERO**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

In this diversity case, defendant/appellant/cross-appellee Lionbridge Technologies, Inc., in appeal No. 07-1125, appeals the denial of a motion for a new trial and the entry of judgment, following a jury trial, in favor of plaintiff/cross-appellant Isabelle DerKevorkian, a former Lionbridge employee, in a dispute arising out of an effort to obtain a permanent resident "green card" for DerKevorkian. In appeal No. 07-1149, DerKevorkian cross-appeals an adverse ruling on summary judgment for attorney Sharryn Ross, an immigration attorney retained by Lionbridge to assist in the green card application process, as well as a reduction of pre-judgment interest on one of the amounts due her from Lionbridge. We affirm in part and reverse and remand in part.[1]

## BACKGROUND

Plaintiff, appellee and cross-appellant Isabelle DerKevorkian is a citizen of France. In 1997, she was hired as a translator by ILE, a company engaged in localization and translation in Boulder, Colorado. Defendant, appellant and cross-appellee Lionbridge Technologies, Inc. bought ILE in 2000, with the result that DerKevorkian became an at-will employee for Lionbridge, working as a translator. DerKevorkian was subsequently promoted to project manager.

---

[1]While no formal order of consolidation has been entered, these cases have been briefed and orally argued together, and we dispose of both of them in this opinion.

DerKevorkian had been issued an H1-B visa, which is valid for three years and can be renewed once for a second three-year term. Her most recent H1-B visa was going to expire on October 1, 2003. If DerKevorkian wished to remain permanently within the United States, however, she needed to obtain a green card denominating permanent resident status.

Lionbridge maintained a Permanent Resident Program ("PRP"), pursuant to which the company would "assist and support long-term employees in the process of applying for lawful permanent resident status." DerKevorkian sought to participate in the PRP. To participate in the program, DerKevorkian agreed to work for Lionbridge for two years after her green card was issued and she agreed to allow an attorney hired by Lionbridge to handle her green card application. On December 17, 2001, Lionbridge approved its sponsorship of DerKevorkian's green card application. As of April 1, 2001, DerKevorkian had been promoted to the position of a "translation manager," a job which involved her supervision of other employees. Her H1-B visa, however, described her job position as only a "translator," and had not been amended to reflect her promotion.

In early March 2002, Lionbridge hired immigration attorney Sharryn E. Ross and her law firm to assist with DerKevorkian's green card application. At that time, it became apparent to everyone that DerKevorkian's H1-B visa needed to be amended to reflect her April 2001 promotion to translation manager, and that such an amendment was necessary prior to the issuance of a green card.

On March 15, 2002, DerKevorkian heard from Ross's law firm that the amendment process should be completed by the end of March. DerKevorkian emailed Ross's assistant on April 12, 2002, asking if he would keep her posted. On April 16, the assistant told DerKevorkian that they had that day requested a prevailing wage determination from the State of Colorado Department of Labor.[2] When Lionbridge, assisted by Ross, obtained the prevailing wage determination on April 18, 2002, DerKevorkian's position of translation manager was classified by the State of Colorado Department of Labor as a "Level Two, General and Operations Manager." The Department's applicable prevailing wage for such a position was $106,288, significantly higher than DerKevorkian's actual salary of $57,000. The prevailing wage for a "Level One" job was $45,053.

On April 24, 2002, Ross discussed the prevailing wage problem with Lionbridge's visa liaison person. They apparently discussed conducting a wage

---

[2]Apparently, it was not necessary to obtain a favorable prevailing wage determination in order for the H1-B visa amendment, but it was necessary for the green card application. See Appellant's App. at 875. The prevailing wage determination requirement was designed to prevent alien workers from undercutting wages for American workers. Typically, the state department of labor would determine the prevailing rate for a job, based on the job's requirements as found in the job description. Thus, based on the job description of the translation manager, the Colorado Department of Labor assigned that job the prevailing wage of $106,288. Within the manager designation, the Colorado Department of Labor only recognized two wage categories (1 or 2). "Translator" was category 1, and "translation manager" was category 2.

Neither Lionbridge nor DerKevorkian viewed $106,288 as an appropriate wage for the translation manager job at Lionbridge. DerKevorkian admitted as much: "It seems to me that it's easy to prove that a manager at my level shouldn't be making $ 106,000." Appellant's App. at 602.

survey to see if that would yield a prevailing wage for DerKevorkian more in line with her current salary. Ultimately, they decided to wait until the issuance of new national prevailing wage guidelines, to see if the new guidelines would be of assistance.

On May 29, 2002, DerKevorkian emailed Ross's assistant again, asking if there had been any progress on her green card application. He responded that there had been a problem with the prevailing wage and that they were waiting for clarification from the national Department of Labor. He further responded on June 4 that there was no new news to report.

On July 15, DerKevorkian again emailed Ross's assistant for an update, expressing concern that seven months had passed since her acceptance in the PRP, yet she was unaware of any real progress. Ross's assistant responded that he could not provide her with any information because the law firm had been instructed to have her direct all inquiries to Lionbridge's visa liaison person.

DerKevorkian then contacted the Lionbridge visa liaison person, who informed her on July 22 that the prevailing wage had come back almost double her salary and that Ross's office was waiting for a memo from the national Department of Labor. When the new national guidelines were issued in August 2002, they did not help DerKevorkian's situation.

On September 17, 2002, DerKevorkian asked for a meeting, noting that as of the following month (October 2002) she would only have one year left on her

H1-B visa, and further stating "I have financial and personal commitments here, and it is really imperative for me to have a realistic outlook of my legal situation in this country." Appellee's Supp. App. at 185.

On September 19, DerKevorkian met with the Human Resources manager and the site manager for Lionbridge, who told her that the only option for pursuing the green card was for DerKevorkian to accept a demotion to translator, without a reduction in pay.[3] DerKevorkian refused, stating that she believed such a demotion would adversely affect her career and would limit her duties to translation work exclusively.

At various points throughout this process, other possibilities were discussed. As indicated, Ross investigated the possibility of performing a cross-industry wage survey, in order to establish a prevailing wage for DerKevorkian's job. When she found out that the survey would cost $10,000, she abandoned that possibility. DerKevorkian herself apparently had some suggestions for solving the prevailing wage problem. She suggested that Lionbridge "tweak" her job description so that it would fall within category 1, without actually changing her

---

[3]DerKevorkian testified that, at the meeting on September 19, she "was told that there had been a problem with the prevailing wage and that only two things could be done. One was to conduct a salary survey, but that wasn't an option; and the other one was for me to move into another role, and at this point [Lionbridge] suggested that I move into a translator position." Appellant's App. at 596. DerKevorkian further stated that that "was the first time that option was ever discussed with [her]." Id.

duties.[4]  Lionbridge refused, on the ground that it would not submit an inaccurate description of DerKevorkian's job duties.[5]  DerKevorkian then suggested that she remain as a translation manager, but that she no longer submit direct reports, to which Lionbridge responded that would leave her with very little to do. DerKevorkian also proposed that Lionbridge apply for a green card listing a different job for DerKevorkian – translator – which DerKevorkian would take after the green card was issued.  Both Ross and another attorney testified that such an approach would be unethical and "an incredibly risky procedure," which "raises a red flag" with the government.  Appellant's App. at 872-73.

After negotiations, Lionbridge and DerKevorkian were unable to agree on a feasible solution, and Lionbridge ultimately failed to file an application with the Bureau of Immigration and Customs Enforcement ("BICE") under the Department of Homeland Security ("DHS") for DerKevorkian's green card.  Her work visa expired on October 1, 2003, and she subsequently resigned her employment and

---

[4]In a September 26, 2002, letter to Jenni Tymkovich, Lionbridge's Human Resources manager, DerKevorkian stated that Lionbridge was "unwilling to modify [her] job description if it turned out to be necessary.  Yet, to [her] knowledge this has been done for many employees before [her]."  Appellant's App. at 484.

[5]One Lionbridge employee testified that, "tweaking a job description . . . was not a viable option because it was not representing what [DerKevorkian's] role would be."  Appellant's App. at 765.  Another employee testified that Lionbridge "could not submit a green card application under a job description that [DerKevorkian] was not currently performing."  Id. at 828.

ultimately left the United States.  DerKevorkian claims she thereafter suffered the

following mental injuries:

> And, well, I sank into a depression.  I couldn't sleep, I couldn't eat, I couldn't function.  I could barely get out of bed.  I had no taste for anything, no energy. . . .  I was just like a ghost.  So I went to a psychologist and then a doctor.  I went to therapy and I had to take antidepressant pills and antianxiety pills.

Id. at 631.  There was testimony about efforts DerKevorkian made to obtain work

after she left the United States.

DerKevorkian sued Lionbridge in Colorado state court on May 18, 2004.

Lionbridge removed the case to federal court based on diversity of citizenship,

because DerKevorkian is French and Lionbridge is a Delaware corporation with

its principal place of business in Massachusetts.  DerKevorkian brought four

claims against Lionbridge:  negligence, breach of fiduciary duty, promissory

estoppel and breach of contract.  After the case was removed to federal court, she

added as defendants Sharryn Ross and her law firm, Ross, Silverman & Levy, and

asserted a legal malpractice claim against them on January 7, 2003.  An amended

complaint asserting a legal malpractice claim against Ross as well as Lionbridge

was filed on March 15, 2005.[6]

---

[6]In her legal malpractice claim, DerKevorkian asserted that Ross had acted as her legal counsel in DerKevorkian's effort to obtain a green card, and that Ross had violated her legal duties with regard to her representation by "representing parties with conflicting interests without full disclosure and informed consent"; by failing to keep DerKevorkian informed as to the progress of the green card application process; by failing to investigate various matters fully; and in other

(continued...)

-8-

After discovery, all defendants filed motions for summary judgment. The district court granted summary judgment against DerKevorkian on her negligence claim, concluding that because Lionbridge's duties to her were "purely contractual in nature," Order at 10-11, Appellant's App. at 226-27, the negligence claim was barred by Colorado's economic loss rule. The district court refused to grant summary judgment against DerKevorkian on the contract, promissory estoppel and breach of fiduciary duty claims. On the breach of fiduciary duty claim, the court concluded that DerKevorkian's trust and confidence that Lionbridge would perform the contract gave rise to a fiduciary duty. In response to Lionbridge's argument that Colorado's Workers' Compensation Act barred the fiduciary duty claim, the court held that the claim was not barred because DerKevorkian sought recovery solely for economic harm.

On Ross's motion for summary judgment, which alleged that there was no attorney-client relationship between herself and DerKevorkian, that DerKevorkian's claim was barred by the statute of limitations, and that no facts supported a claim that Ross committed legal malpractice by breaching a fiduciary duty owed to DerKevorkian, the district court ruled in favor of Ross on the ground that there was no evidence of an attorney-client relationship. Even though the court granted summary judgment to Ross on the ground of the lack of an

_____

    [6](...continued)
respects. Amended Compl. at ¶ 117, Appellant's App. at 72-75.

attorney-client relationship, the court ruled against Ross on the statute of limitations issue.

The case was tried to a jury on the three claims (breach of contract, breach of fiduciary duty and promissory estoppel) in December 2006. At trial, the district court refused the instruction Lionbridge sought concerning DerKevorkian's mitigation of damages by taking a demotion to the translator job. The jury returned a verdict against Lionbridge on the contract claim, awarding DerKevorkian $313,570.20 in economic damages. The jury also returned a verdict against Lionbridge on the fiduciary duty claims and awarded DerKevorkian $1,000,000 in non-economic damages.

Lionbridge moved for a new trial or to amend the judgment. The district court held that the jury's economic damage award was "not supported by any evidence in the record," Order at 16, Appellant's App. at 459, and granted a new trial unless DerKevorkian accepted a remittitur to $221,433, which she did. The court also reduced the $1,000,000 non-economic damages award to $366,250, the maximum permitted by Colorado law, Colo. Rev. Stat. § 13-21-102.5(3)(a), for non-economic loss. The district court rejected Lionbridge's argument that the non-economic damage award must be reduced to zero under the Workers' Compensation Act. The court concluded that the Act did not apply, as DerKevorkian had not suffered a "personal injury" under the Act, which the district court thought required bodily harm.

-10-

With respect to the fiduciary duty claim, the court rejected Lionbridge's argument that, as a matter of law, it erred in finding that Lionbridge owed its employee, DerKevorkian, a fiduciary duty arising from the "purely contractual" obligation to support and assist her in obtaining permanent residency. The court held that DerKevorkian had, starting in 1997, "trusted" Lionbridge "to represent her interests in the handling of various filings in order for her to continue to work in the United States." Appellant's App. at 451. The court accordingly concluded that Lionbridge's fiduciary duty to DerKevorkian existed "at least prior to the time they entered into a contract related to [DerKevorkian's] green card application." Id.

DerKevorkian also moved to amend the judgment, asking the district court to apply a 9% rate of pre-judgment interest (the rate for "personal injury") to the non-economic award; to start the pre-judgment interest running as of October 1, 2002, a year before she had to leave the country and thus the day her action accrued; and to award pre-judgment interest on the entire uncapped amount of the non-economic award. The court did award pre-judgment interest at the rate of 9% – the rate for "damages for personal injuries sustained by any person" pursuant to Colo. Rev. Stat. § 13-21-101(1). The court agreed that DerKevorkian's cause of action accrued on October 1, 2002, so that interest on the non-economic award began to run on that date. However, the court awarded interest only on the final, capped award of $366,250, not the original jury award of $1,000,000.

Lionbridge filed this timely appeal. It argues the district court erred in: (1) concluding that DerKevorkian did not suffer a "personal injury" for which the Colorado Workers' Compensation Act provides the exclusive remedy because she did not experience a "harmful change in the body"; (2) finding that Lionbridge had been in a confidential fiduciary relationship with DerKevorkian, even though their fundamental relationship was a contractual one of employer-employee; and (3) refusing to instruct the jury that it could consider whether DerKevorkian acted reasonably in refusing the translator job with Lionbridge that, although a demotion, would arguably have permitted her to remain in the United States working for Lionbridge.

DerKevorkian cross-appeals, arguing: (1) in her cross-appeal against Lionbridge, that the district court erred in failing to award her pre-judgment interest on the amount of damages assessed by the jury, as opposed to the capped amount ultimately awarded; and (2) against attorney Ross, that the district court erred in holding that there was no attorney-client relationship because DerKevorkian did not understand that Ross was supposed to be acting as her attorney.

**DISCUSSION**

"We review de novo a district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonprevailing party." Mullin v. Travelers Indem. Co., 541 F.3d 1219, 1222 (10th Cir. 2008). Summary judgment is appropriate if "there is no genuine dispute over any material fact, and a party is entitled to prevail as a matter of law." Id. (further quotation omitted); see Fed. R. Civ. P. 56(c). As this is a diversity action, we must apply Colorado law to the issues involved. State Farm Mut. Auto. Ins. Co. v. Boellstorff, 540 F.3d 1223, 1228 (10th Cir. 2008). "In so doing, 'we apply the most recent statement of state law by the Colorado Supreme Court.'" Id. (quoting Clark v. State Farm Mut. Auto. Ins. Co., 433 F.3d 703, 709 (10th Cir. 2006)). "Absent such guidance, we consider 'decisions of a state's intermediate appellate courts [as] some evidence of how the state supreme court would decide the issue,' though such decisions are only persuasive authority." Id. (quoting Clark, 433 F.3d at 709). Furthermore, in affirming a grant of summary judgment, "we have discretion to affirm on any ground adequately supported by the record, so long as the parties have had a fair opportunity to address that ground." Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1088 (10th Cir. 2006) (further quotations omitted).

**I. Workers Compensation Act:**

Lionbridge argues first that the district court erred in holding that Colorado's Workers Compensation Act ("WCA") did not bar DerKevorkian's

-13-

claim for emotional distress personal injury damages. The district court ruled on Lionbridge's motion for summary judgment that claims for tort injuries for economic injuries and harm affecting a proprietary or financial interest are not "personal injuries" within the meaning of the WCA. Thus, it ruled that DerKevorkian's tort-based claim for breach of fiduciary duty was not precluded by the Act. It ruled similarly on Lionbridge's motion for a new trial and/or to alter or amend the judgment. Order at 11-12, Appellant's App. at 454-55 ("The emotional distress incurred by [DerKevorkian], and related damages awarded as compensation therefore, were a result of [Lionbridge's] breach of its fiduciary duty; it was not a mental injury incurred as a result [of] or arising out of a work-related accident, injury or occupational disease.").

"The WCA is an employee's exclusive remedy for compensation by an employer for certain work-related injuries." Serna v. Kingston Enters., 72 P.3d 376, 379 (Colo. Ct. App. 2002). Under the WCA, an employee surrenders, as against his or her employer, "all causes of action, actions at law, suits in equity, proceedings, and statutory and common law rights and remedies for and on account of such death of or personal injury to any such employee and accruing to any person." Colo. Rev. Stat. § 8-41-102. "Conversely, however, an employee does not, under the WCA, surrender any cause of action for injuries apart from 'personal injuries.'" Serna, 72 P.3d at 379.

The Colorado Court of Appeals has concluded that "as used in the WCA, the terms 'personal injury' and 'personal injuries' refer to the job-related physical or mental injuries of an employee." Id. It further observed that "personal injury" "'includes any harmful change in the body.'" Id. (quoting 3 Larson's Workers Compensation Law, ch.55 at 55-1 (2002)). "[A]s a matter of law, job-related emotional or mental injuries arising out of employment fall within the scope of the Workers' Compensation Act." Hoffsetz v. Jefferson County Sch. Dist., 757 P.2d 155, 158 (Colo. Ct. App. 1988).

We agree with Lionbridge that DerKevorkian's injury in the form of depression and anxiety, and its associated physical manifestations, is a mental injury which could be covered by the WCA. That, however, is not the end of the inquiry. The WCA is only the exclusive remedy for personal injuries "arising out of and in the course of the employee's employment." Colo. Rev. Stat. § 8-41-301(1)(b), (2)(a). Lionbridge argues that DerKevorkian's injuries did indeed arise out of and in the course of her employment because (1) she suffered the injuries while she was a Lionbridge employee and "the tortious conduct that DerKevorkian identified was committed by her fellow employees during work time, at work, while performing their duties under a program that their employer sponsored," Appellant's Op. Br. at 32; and (2) DerKevorkian's employment with Lionbridge was a "but-for" cause of her injury since, "if she were not an

-15-

employee, she could not have participated in the program." Id. We disagree with Lionbridge.

"The phrases 'arising out of' and 'in the course of' are not synonymous and a claimant must meet both requirements." Horodyskyj v. Karanian, 32 P.3d 470, 475 (Colo. 2001). "The latter requirement refers to the time, place, and circumstances under which a work-related injury occurs . . . [such that] an injury occurs 'in the course of' employment when it takes place within the time and place limits of the employment relationship and during an activity connected with the employee's job-related functions." Id. The "arises out of" requirement "refers to the origin or cause of an injury." Id. "An injury 'arises out of' employment when it has its origin in an employee's work-related functions and is sufficiently related to those functions to be considered part of the employee's employment contract." Id.

We agree with the district court that DerKevorkian's claimed injuries did not occur in the course of or arise out of her employment. They came about because of a completely separate agreement to assist her with her green card application. While it is true that she would not have been eligible to participate in the PRP were she not a Lionbridge employee, and it would have been mutually beneficial to both her and Lionbridge had she obtained a green card, we cannot say that her injuries occurred in connection with, or stemmed from, work-related

-16-

activities or were related to her actual job function as a translator, translator manager, or any other functions she performed at Lionbridge.

## II. Fiduciary Relationship:

Among other claims, DerKevorkian alleged that Lionbridge had breached a fiduciary duty it owed to her with respect to its handling of its efforts to obtain a green card for her, and that she incurred damages from that breach. In its motion for summary judgment, Lionbridge argued that DerKevorkian had failed to state a claim for breach of a fiduciary duty under tort law, and, in any event, the economic loss rule barred DerKevorkian's tort claim for breach of fiduciary duty. The district court held, in its order granting in part and denying in part Lionbridge's motion for summary judgment, as follows:

> Although [DerKevorkian's] bare allegation that Lionbridge breached its fiduciary duty is admittedly conclusory, the factual allegations in [DerKevorkian's] complaint are sufficient to support her contention that Lionbridge owed her a fiduciary duty based either on an agency or a confidential relationship in order to state a claim under Colorado law. . . [DerKevorkian's] allegations in her amended complaint, although minimal, adequately assert[ ]a legal theory for breach of fiduciary duty, and set[ ] forth sufficient facts in support thereof, cognizable under Colorado law.

Order at 13, Appellant's App. at 229. The district court further concluded that the economic loss rule was not applicable, because the court had "determined that [DerKevorkian] has adequately stated facts to support a finding of an independent

-17-

fiduciary duty." Order at 14, id. at 230.[7] Lionbridge appeals that determination, arguing that "as a matter of law, Colorado's economic loss rule bars DerKevorkian's breach of fiduciary duty claim." Appellant's Op. Br. at 33.

As an initial matter, DerKevorkian argues that "Lionbridge failed to move for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a)(1) with respect to the factual dispute whether a confidential relationship existed between it and DerKevorkian. Therefore, it waived the issue on appeal." Appellant's Op. Br. at 58. We have "held that the denial of summary judgment based on factual disputes is not properly reviewable on an appeal from a final judgment entered after trial." Haberman v. The Hartford Ins. Co., 443 F.3d 1257, 1264 (10th Cir. 2006). Rather, "the proper redress would not be through appeal of that denial [of summary judgment] but through subsequent motions for judgment as a matter of law . . . and appellate review of those motions if they were denied." Whalen v. Unit Rig, Inc., 974 F.2d 1248, 1251 (10th Cir. 1992); see also Kelley v. City of Albuquerque, 542 F.3d 802, 820 (10th Cir. 2008). However, "[w]here a motion for summary judgment based on an issue of law is denied, appellate review of the motion is proper even if the case proceeds to trial and the moving party fails to

_____

[7]The district court essentially reiterated this conclusion in its order denying Lionbridge's motion for a new trial, motion to alter or amend the judgment and motion for a remittitur and DerKevorkian's motion to alter or amend the judgment.

make a subsequent Rule 50 motion." Id. (quoting Wilson v. Union Pac. R.R., 56 F.3d 1226, 1229 (10th Cir. 1995)).

In this case, DerKevorkian argues that a special, confidential relationship existed between her and Lionbridge, independent of any contractual employer-employee relationship that existed, that created a fiduciary duty supporting an award of damages based on the tort of breach of fiduciary duty. While she tries to argue that the existence of such a relationship, giving rise to a fiduciary duty, is a factual question, Colorado law makes clear that the overarching question is a legal one. "The question of whether a defendant owes a plaintiff a duty to act to avoid injury is a question of law to be determined by the court. The court determines, as a matter of law, the existence and scope of the duty." Town of Alma v. Azco Constr. Co., 10 P.3d 1256, 1264 (Colo. 2000).[8] The issue of the existence of such a duty is therefore properly before us, even though Lionbridge did not file a motion for judgment as a matter of law on the point.

We turn now to whether the district court properly concluded that a confidential relationship existed giving rise to a fiduciary duty owed by

_____

[8]It is true that the district court explored various ways by which DerKevorkian could establish the existence of a fiduciary duty, whether through the existence of an agency relationship between Lionbridge and DerKevorkian or through the existence of some sort of confidential relationship. While there may be some subsidiary factual issues involved in assessing the existence of such a relationship in the abstract, in this case, there was no dispute as to the basic facts regarding the relationship between Lionbridge and DerKevorkian. The dispute is in the legal characterization of that relationship.

-19-

Lionbridge to DerKevorkian which supported a damage award not barred by the economic loss rule. We first examine Colorado law regarding fiduciary duties under tort law in the context of a contractual relationship and the economic loss rule.

Under Colorado law, "[c]ontract obligations arise from promises the parties had made to each other, while tort obligations generally arise from duties imposed by law to protect citizens from risk of physical harm or damage to their personal property." A.C. Excavating v. Yacht Club II Homeowners Ass'n, Inc., 114 P.3d 862, 865-66 (Colo. 2005). The economic loss, or independent duty, rule is "intended to maintain the boundary between contract law and tort law." Town of Alma, 10 P.3d at 1259. Thus, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law. Economic loss is defined generally as damages other than physical harm to persons or property." Id. at 1264. The tort duty must be independent of any contractual duties: "A breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie. A breach of a duty *arising independently* of any contract duties between the parties, however, may support a tort action." Id. at 1262.

Colorado law recognizes that "some special relationships by their nature automatically trigger an independent duty of care that supports a tort action even

-20-

when the parties have entered into a contractual relationship." Id. at 1263. Thus, an attorney-client, or physician-patient, or insurer-insured relationships may give rise to such a duty of care. Id. In denying Lionbridge's request for a new trial, the district court found "that there was sufficient evidence presented to establish a special relationship that would give rise to a fiduciary duty not recognized in the usual employment relationship, as well as a breach of that duty." Order at 10, Appellant's App. at 453. The district court characterized that special relationship as a "confidential fiduciary relationship" which Lionbridge had with DerKevorkian.

A confidential relationship "exists when one party justifiably reposes confidence in another such that the parties drop their guard and assume that each side is acting fairly." Lewis v. Lewis, 189 P.3d 1134, 1143 (Colo. 2008). Colorado does not "'recognize a separate tort founded upon breach of a confidential relationship.'" Univ. of Colo. Found., Inc. v. American Cyanamid, 880 F. Supp. 1387, 1404 (D. Colo. 1995), aff'd in part, vac'd in part on other grounds, 196 F.3d 1368 (Fed. Cir. 1999)(quoting Bock v. Brody, 870 P.2d 530, 533 (Colo. Ct. App. 1993)). However, "a confidential relationship may serve as an indication of fiduciary status." Lewis, 189 P.3d at 1143. Furthermore, "[t]he confidential relationship . . . must be established prior to the date of the transaction that gives rise to the claim." Vikell Investors Pac., Inc. v. Kip Hamden, Ltd., 946 P.2d 589, 597 (Colo. Ct. App. 1997).

-21-

In order to establish, under Colorado law, a breach of a fiduciary duty arising from a confidential relationship between two parties:

> there must be proof, among other things, that (1) either the reposing of trust and confidence in the other party was justified, or the party in whom such confidence was reposed either invited, ostensibly accepted, or acquiesced in such trust; (2) the alleged trustee assumed a primary duty to represent the other party's interest in the subject of the transaction; (3) the nature and scope of the duty that arose by reason of the confidential relationship extended to the subject mater of the suit; and (4) that duty was violated, resulting in damage to the party reposing such confidence.

Equitex, Inc. v. Ungar, 60 P.3d 746, 752 (Colo. Ct. App. 2002) (quoting Jarnagin v. Busby, Inc., 867 P.2d 63, 67 (Colo. Ct. App. 1993)); see also Grynberg v. Total, S.A., 538 F.3d 1336, 1346-47 (10th Cir. 2008).

The parties do not cite to us, nor are we aware of, any Colorado case stating that an at-will employer-employee relationship should give rise to a confidential relationship indicative of a fiduciary duty in anything close to the circumstances of this case. Thus, we must consider whether Lionbridge's acceptance of DerKevorkian in the PRP created such a duty.

There is an initial question of whether Lionbridge may make the argument that the confidential relationship must be in existence prior to the date of the "transaction" giving rise to the complaint—in this case, the agreement that DerKevorkian could participate in the PRP. The district court held, in denying Lionbridge's motion for a new trial, that:

-22-

the evidence at trial was that during the duration of her employment, starting in 1997, [DerKevorkian] trusted [Lionbridge] to represent her interests in the handling of various filings in order for her to continue to work in the United States. From the beginning of their employment relationship, at least prior to the time they entered into a contract related to [DerKevorkian's] green card application, [Lionbridge] had a high degree of control and [DerKevorkian] placed a significant amount of trust and confidence that [Lionbridge] would look after her best interests related to her ability to work in the United States as its employee.

Order at 8, Appellant's App. at 451. However, that was, in essence, an alternative finding, because the district court first observed that Lionbridge had tendered jury instructions regarding the breach of a confidential fiduciary relationship which did not contain the preexistence requirement, which instructions were, in fact, given to the jury, and Lionbridge raised the preexistence issue for the first time in its post-trial motions. The district court therefore held that Lionbridge had waived this issue. Lionbridge responds that it had properly raised in its motion for summary judgment the general issue of the existence of a confidential relationship fiduciary duty, which includes the question of when the relationship must be established, and, in any event, the parties cannot stipulate to an error of law. Further, it argues the evidence at trial fails to support the conclusion that the confidential relationship preexisted DerKevorkian's acceptance into the PRP.

We agree with the district court that Lionbridge has waived its right to raise the issue of the preexistence of the confidential relationship. It did not raise this as an element of the confidential relationship prior to post-trial motions. Thus,

-23-

neither the district court nor the jury had the opportunity to assess any such requirement. Moreover, while hardly overwhelming, we find sufficient evidence supporting the district court's conclusion that, throughout their employment relationship, DerKevorkian invariably relied upon Lionbridge and its expertise and experience to assist her in obtaining whatever documentation was necessary to remain a legal worker in the United States. This culminated in the PRP, pursuant to which we agree with DerKevorkian and the district court that Lionbridge assumed a fiduciary duty to assist her and support her in her green card application.

We do not, however, view the relationship as completely one-sided. As time went on, and as the difficulties were encountered with the prevailing wage determination, we believe DerKevorkian assumed some duty to cooperate with Lionbridge as well. To be sure, the parameters of this reciprocal duty are problematic, as illustrated by several hypothetical scenarios we could pose.[9] But,

---

[9]It is important to remember that the fundamental over-arching relationship between Lionbridge and DerKevorkian was that of employer and at-will employee. Thus, if, for example, shortly after her acceptance into the PRP, Lionbridge decided, for reasons completely unrelated to DerKevorkian's green card application, to terminate her at-will contract, would Lionbridge nonetheless be obligated to continue with her green card application? If, again shortly after her acceptance into the PRP, Lionbridge told DerKevorkian that it had encountered insoluble problems with her green card application (prevailing wage problem, inability to "tweak" her job description, etc.) and it would unfortunately be unable to further process her green card application, would she be able to force Lionbridge to continue? If Lionbridge never invited DerKevorkian to participate in the PRP, or refused to accept her when she sought entry, would she be able to

(continued...)

-24-

as time passed, there developed a mutual obligation to explore all alternatives to achieve the goal sought—a green card for DerKevorkian. Thus, while we agree that Lionbridge assumed a duty to DerKevorkian, and there is sufficient evidence in the record to uphold the jury's verdict finding a breach of that duty, we regard DerKevorkian as assuming a duty as well. Her duty, in turn, brings us to the issue of her obligation to mitigate her damages stemming from Lionbridge's breach.

### III. Mitigation of Damages:

"One of Lionbridge's primary defenses in this case was that the plaintiff could have mitigated her damages, and remained in the United States, by taking the lead translator position, offered to her at the same salary as her then-current job." Appellant's Op. Br. at 43. The district court refused to give such an instruction, on the ground that "the translator position as a matter of law was not substantially similar to the translation manager position." Appellant's App. at 989. Lionbridge argues this was an error by the district court, in that "[t]he defense presented a question of fact that the jury should have been allowed to consider," that "Lionbridge was prejudiced by its exclusion from trial" and that

---

[9](...continued)
force Lionbridge to do so? We doubt it. The answers to these questions suggest that Lionbridge's "duty" to DerKevorkian was limited, initially, but increased as time passed, as the time drew nearer for her green card application to be filed, and as she forbore taking any other action to enable her to remain in the country.

we should "remand for a new trial on damages with the defense submitted to the jury." Appellant's Op. Br. at 43.

"We review the district court's decision to give a particular jury instruction for abuse of discretion and consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." Garcia v. Wal-Mart Stores, Inc., 209 F.3d 1170, 1173 (10th Cir. 2000) (further quotation omitted). The district court relied upon Fair v. Red Lion Inn, 943 P.2d 431 (Colo. 1997), in refusing to give an instruction regarding DerKevorkian's mitigation of damage by taking the translator job. Fair is not, however, particularly applicable to this case. Thus, we agree with Lionbridge that it was error to refuse to permit the jury to evaluate whether it was reasonable for DerKevorkian to refuse to accept the translator job in an effort to reduce or minimize her damages.

Fair was a wrongful termination case involving a breach of contract action by a former employee against her former employer. The Colorado Supreme Court held that "if the injured party receives an unconditional offer of reinstatement to the same or a similar position and rejects such unconditional offer in the absence of special circumstances, the ongoing accrual of damages must terminate." Id. at 438. Thus, the "duty" to "mitigate" damages arises only when the offer is for reinstatement to a "same or a similar position." In our view, the concept of "mitigating" DerKevorkian's damages in this case by requiring her to accept the

-26-

same or a similar job is misleading. That is because DerKevorkian did not seek a

similar *job*. What she sought was a *green card*. When Lionbridge accepted her

into the PRP, and thereby incurred a duty to assist her, it was in furtherance of

her obtaining a green card, not necessarily a green card *with the same or similar*

*job*. To be sure, Lionbridge could not have dramatically demoted her and avoided

being charged with failing to fulfill its end of the bargain/duty it incurred by

accepting her into the PRP, but it was primarily charged with helping

DerKevorkian obtain a green card so she could continue working for Lionbridge

in the United States. Thus, Lionbridge should have been able to present squarely

before the jury the question of whether, in addition to any other action on her

part, DerKevorkian had some "duty" to accept the translator job in order to obtain

her green card.[10]

In evaluating whether the district court erred in failing to give the

particular instruction that Lionbridge tendered, as opposed to some other

instruction generally setting out DerKevorkian's obligation to mitigate her

damages, we are hampered by the fact that the instruction Lionbridge tendered,

---

[10]We further agree with Lionbridge that it adequately preserved this issue.
In discussing jury instructions, Lionbridge's attorney stated that "Lionbridge
objects to instructing the jury without the proposed language in the second
paragraph . . . [that] the plaintiff refused to accept an offer from defendant for a
translator position. . . . [G]eneral rules of mitigation apply, and so it is an
appropriate factor for the jury to consider, and on that basis we would like to
preserve the objection." Appellant's App. at 989-90. While a little cryptic, we
discern from that exchange that Lionbridge preserved its objection to the refusal
to include an instruction on DerKevorkian's refusal to accept the translator job.

and it now claims should have been given, is not a part of this record. Nonetheless, the district court referred to it generally in its order on Lionbridge's post-trial motions, and characterized it as "direct[ing] the jury to find that Plaintiff necessarily failed to mitigate her damages by refusing to immediately accept the demotion. Defendant's tendered instruction indicated that its affirmative defense was 'proved' if the jury found that Plaintiff 'refused to accept an offer from Lionbridge for a translator position." Order at 4, Appellant's App. at 447.

We agree with the district court that such an instruction directing the jury to find that DerKevorkian had failed to mitigate her damages by refusing to take the translator job would have been in error. However, some instruction giving the jury the opportunity to weigh DerKevorkian's duty to compromise to some extent to consider a less desirable job, if that meant she could obtain her green card, was in order.[11] We accordingly remand to the district court for a new trial on damages

---

[11]The instruction actually given referred only generally to DerKevorkian's duty to mitigate her damages:

> Instruction No. 18.
> If you find that plaintiff, Isabelle DerKevorkian, has had damages then you must consider whether defendant, Lionbridge Technologies, Inc., has proved its affirmative defense of plaintiff's failure to mitigate or minimize damages.
>
> The plaintiff has a duty to take reasonable steps under the circumstances to mitigate or minimize her damages. Damages, if any, caused by the plaintiff's failure to take such reasonable steps

(continued...)

for breach of a fiduciary duty, with the admonition that DerKevorkian's obligation to consider other job positions is not limited to jobs which are the same or similar to her job at the time she left Lionbridge. We realize that, in a certain sense, a retrial on damages amounts to a retrial on liability. Had DerKevorkian taken the translator job, we assume she would have received her green card and would therefore have suffered no damage. Thus, if the jury determines that she should have done that in mitigation, in effect that could amount to a finding of no liability on Lionbridge's part. We do not, however, know to a certainty that she would have gotten her green card had she accepted the demotion to translator. As it is, DerKevorkian did *not* get her green card and, in determining the damage *Lionbridge* caused DerKevorkian because of that failure, the jury must be able to fully evaluate whether, or to what extent, DerKevorkian herself contributed to, or failed to mitigate, the damages she suffered.

---

[11](...continued)
cannot be awarded to the plaintiff. This affirmative defense is proved if you find the following has been proved by a preponderance of the evidence:

Plaintiff did not take reasonable steps under the circumstances to find alternative employment.

Appellant's App. at 1019. That instruction mentions "alternative employment," but because the district court had previously ruled that the translator job was not similar to the translation manager job DerKevorkian occupied at the time of her green card application process, the jury was prohibited from considering whether acceptance of the translator job could be considered a mitigation of damages.

**IV. Summary Judgment for Ross:**

The district court granted summary judgment in favor of Ross against DerKevorkian on DerKevorkian's action for legal malpractice, on the ground that DerKevorkian had submitted insufficient evidence of an attorney-client relationship to raise a genuine issue of material fact. We affirm, but for a different reason than did the district court.

Even if there was an attorney-client relationship between Ross and her law firm and DerKevorkian, about which we express no opinion, any cause of action for malpractice arising therefrom accrued more than two years before DerKevorkian sued Ross on January 7, 2005, and thus is barred by the applicable statute of limitations. A claim for legal malpractice must be commenced within two years after the cause of action accrues. Colo. Rev. Stat. § 13-80-102(1); Torrez v. Edwards, 107 P.3d 1110, 1113 (Colo. Ct. App. 2004). Colorado has adopted the discovery rule for legal malpractice actions. Accordingly, a "claim accrues when a plaintiff learns 'facts that would put a reasonable person on notice of the general nature of damage and that the damage was caused by the wrongful conduct of an attorney." Rantz. v. Kaufman, 109 P.3d 132, 136 (Colo. 2005) (quoting Morrison v. Goff, 91 P.3d 1050, 1053 (Colo. 2004)).

DerKevorkian claims she did not know that Ross was her attorney until late 2004. Ross claims DerKevorkian knew Ross was her attorney, and believed that Ross was responsible in part for her inability to get a green card, in late 2002.

Indeed, DerKevorkian conceded that she retained her current counsel in late 2002 (she believes November) and that she knew in late summer or in September 2002 that her green card would not go through. See Appellee's Supp. App. at 42-43, 45-46, 48. Even though DerKevorkian argues that she did not really know that her green card application would fail until January 7, 2003, because that is when Lionbridge apparently informed her finally that it would not be able to obtain the card, DerKevorkian's claim against, and relationship with, Ross is different from that with Lionbridge. She may still have pursued a legal malpractice action against Ross, even had her green card ultimately been awarded, based upon some perceived disadvantage she incurred because of the way Ross handled her green card application.[12]

In short, we affirm the district court's grant of summary judgment against DerKevorkian and in favor of Ross on the ground that the statute of limitations had expired at the time DerKevorkian filed her action against Ross and her firm.

Because we remand for a retrial on damages, we do not address the other issues relating to the damage award.

---

[12]We are of course aware of the somewhat anomalous situation that DerKevorkian, on the one hand, argues she had an attorney-client relationship with Ross, but, on the other hand, that she had no idea Ross was her attorney committing legal malpractice in her case until late 2004.

## CONCLUSION

For the foregoing reasons, we AFFIRM in part, and REVERSE and REMAND for a new trial on damages for breach of a fiduciary duty, in accordance with this opinion.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge

07-1125 and 07-1149, DerKevorkian v. Lionbridge Technologies, Inc.

**LUCERO**, J., concurring.

Although I agree with the outcome reached by the majority, I would affirm the district court's grant of summary judgment on the legal malpractice claim against Ross based on the lack of an attorney-client relationship and not based on the statute of limitations.  In all other respects, I join the order and judgment.