Filed 3/24/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MICHAEL REYNAUD et al., | B290836 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC632972) |
| v. | |
| TECHNICOLOR CREATIVE SERVICES USA, INC., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Rafael A. Ongkeko, Judge.  Affirmed.

Faegre Baker Daniels, Faegre Drinker Biddle & Reathy, Ellen E. Boshkoff and Amanda Semaan for Defendant and Appellant.

Lipow & Harris, Jeffrey A. Lipow; Law Office of Rob R. Nichols, Rob R. Nichols; Benedon & Serlin, Douglas G. Benedon and Wendy S. Albers for Plaintiffs and Respondents.

_____

Plaintiffs and respondents Michael Reynaud and Fiona Reynaud[1] prevailed at trial on their negligence cause of action against defendant and appellant Technicolor Creative Services USA, Inc. (Technicolor).  Technicolor appeals, arguing, first, that the verdict is unsupported by substantial evidence and, second, that the damages awarded for emotional distress are, at least in part, barred by workers' compensation exclusivity.  We disagree with each of these contentions and, therefore, affirm the judgment.

## FACTUAL BACKGROUND[2]

I. *Technicolor Employs Michael, a British Citizen, and Sponsors a Series of Temporary Work Visas*

Michael, a British citizen, was born and grew up in the south of England.  In 2005, he moved to Los Angeles to attend business school at the University of Southern California (USC).  In 2007, after obtaining a master of business administration (MBA) degree, he accepted a job and started working for Technicolor as a "global associate."  Technicolor arranged and sponsored a series of temporary work visas for Michael, allowing him to remain in Los Angeles.

In 2010, Michael and Fiona, a British citizen based in England, began a romantic, long-distance relationship.  Their

---

[1]    Because Michael and Fiona share the same last name, for clarity we refer to them, individually, by their first names.  No disrespect is intended.  We refer to them, collectively, as "the Reynauds."

[2]    We summarize the facts in the light most favorable to the judgment.  (*Atempa v. Pedrazzani* (2018) 27 Cal.App.5th 809, 813, fn. 3.)

first daughter was born in England in 2011.  Fiona travelled to Los Angeles as often as possible and, following her marriage to Michael in 2015, was able to move there with her daughter based on Michael's work visa.  The Reynauds' second daughter was born in Los Angeles later that year.

II. *Technicolor Agrees to Sponsor Michael's Green Card*

Knowing that his work visa was set to expire in a few years, Michael asked Technicolor, toward the end of 2013, to sponsor him for a green card.[3]  He was told, informally, that "it wouldn't be a problem."  It was not until October 2014, however, that he received an e-mail from Cecilia Salazar (Salazar), Technicolor's mobility manager, indicating that the company had agreed to sponsor him.  Fiona was "[a]bsolutely over the moon" when she learned the news.  To Michael, "it felt like the pieces of [their] lives were really coming together. . . .  It meant that [they] could stay [in Los Angeles] and achieve what [they] wanted to achieve."  Even Salazar considered it "great news" because Technicolor "doesn't sponsor everyone."

III. *Technicolor's Handling of Michael's Green Card Matter*

A. <u>The employment-based green card process</u>

The employment-based green card process has three primary stages:  (1) applying for a permanent labor certification (PERM) from the Department of Labor (DOL); (2) filing an immigrant petition (I-140) and supporting documents with the

---

[3]     We use the term "green card" to refer to legal permanent resident status in the United States.  (*U.S. v. Ross* (9th Cir. 2004) 372 F.3d 1097, 1103, fn. 1; see also Black's Law Dict. (9th ed. 2009) p. 770, col. 2 [defining "green card" as "[a] registration card evidencing a resident alien's status as a permanent U.S. resident"].)

3

United States Custom and Immigration Service (USCIS); and (3) filing an adjustment of status form (I-485) with the USCIS to become a legal permanent resident—that is, obtain a green card.

Several steps are required before the initial PERM application can be filed. The employer must draft a description of the job that it seeks to fill with the foreign worker; set the minimum requirements for the position; apply for a prevailing wage determination from the DOL; and conduct advertising and recruitment to establish that there is no interested U.S. citizen or permanent resident who meets the minimum requirements for the position. If a minimally qualified U.S. worker applies for the position, the PERM application cannot be filed.

Once filed, 86 to 87 percent of PERM applications are approved by the DOL without an audit. Jay Ruby (Ruby), an attorney specializing in "corporate immigration, employment-based visas and permanent residence" who was retained by Technicolor for immigration matters, could not recall having any of the hundreds of PERM applications he filed for the company denied.

B. <u>Delays in obtaining the PERM</u>

Salazar and Lori Presson (Presson), a human resources representative, were the primary Technicolor employees involved in the sponsorship of Michael's green card.

As a mobility manager, Salazar spent most of her time working on temporary work authorizations and green cards for Technicolor's foreign employees. She worked directly with outside immigration counsel, coordinating matters between the lawyers, the company, and the employee. For Michael's green card matter, she interacted with Ruby, a partner at the law firm

4

Ogletree, Deakins, Nash, Smoak & Stewart, P.C. (Ogletree), and Kara M. Dujenski (Dujenski), a law clerk at the firm.

Michael's green card case was the first that Presson had worked on, and she was unfamiliar with the process. Her role was to respond to requests from immigration counsel conveyed through Salazar.

Both Salazar and Presson knew that Michael's green card application was time sensitive. The goal was to be as far along in the process as to allow Michael to remain in the United States beyond the expiration of his temporary work visa.

1. *Determining minimum job requirements*

Developing minimum job requirements for the position Technicolor sought to fill with Michael was of crucial importance to obtain the PERM. Technicolor's objective in crafting those requirements was to ensure that, while Michael could meet them, they were sufficiently narrow so that other applicants could not. The requirements also had to be consistent with Technicolor's actual hiring practices so that truthful representations were made to the government under penalty of perjury.

In late October 2014, Dujenski e-mailed Salazar drafts of the advertising text, job description, and requirements for Michael's sponsored position. Apart from requiring an MBA or closely related degree, the requirements still needed to be determined.

Dujenski offered to schedule a call with Salazar and Michael's manager to discuss how to define the minimum job requirements. In Dujenski's experience, setting up such a call could help to quickly and efficiently finalize the requirements. Although Dujenski indicated that the requirements had to be finalized before proceeding to the other steps of the green card

process, such as obtaining verification of Michael's experience, no call between Dujenski, Salazar, and Michael's manager ever took place.

It was not until over nine months later, in mid-August 2015, that the minimum requirements for the sponsored position were sufficiently finalized to proceed to the next crucial step of compiling evidence verifying that Michael could meet those requirements.

2. *Verifying Michael's experience*

After defining the job requirements, the next step is to verify the sponsored employee's experience. An employment verification letter (EVL), on company letterhead from a former employer, attests to the dates and titles of previous employment and the experience and skills gained there. EVLs serve as primary evidence that the foreign worker is qualified to meet the minimum requirements for the sponsored job.

Although a PERM application may be filed without first obtaining EVLs, Technicolor's protocol was to wait for them. Technicolor followed this practice in Michael's case, despite Ruby's suggestion to Salazar that they proceed to the recruitment stage before they had received all of Michael's EVLs.

In September 2015, Salazar sent Michael draft EVLs to provide to his former employers. This was the first time that Michael had heard about EVLs from anyone at Technicolor since he had an initial discussion with Salazar in October 2014 about providing evidence to verify his experience. During that initial discussion, Michael shared with Salazar his concern about obtaining a letter from one of his former employers in England, Observer Standard Newspapers (Observer Standard). Michael had previously been married to the daughter of the Observer

Standard's owners.  Following their "messy" divorce, Michael's ex-wife and her family had "a lot of animosity" toward him, and Michael thought it unlikely that they would assist him with the letter.  Salazar told Michael that they did not need to worry about that for now and could deal with it later.  Salazar never told Michael that moving forward with the green card application was dependent on obtaining an EVL from Observer Standard by a particular date.

After Salazar sent the draft EVLs to Michael in September 2015, Michael reminded Salazar of his concern about approaching Observer Standard.  Salazar asked Michael if he could provide other supporting documentation of his employment and experience gained there.  She did not, however, advise him of any time sensitivity.  Seven weeks later, Salazar informed Michael, for the first time, that the matter was urgent.  Salazar wrote to Michael:  "We don't have much time to work with on our end; therefore, we need to determine what experience we can use to frame the case and move forward to the next step."  Michael tried but was unable to obtain an alternative form of documentation regarding his employment at Observer Standard.

The EVL from Observer Standard was ultimately obtained by Presson in March 2016.

IV. *Because Michael Did Not Obtain a Green Card, the Reynauds Are Forced to Return to England*

On January 5, 2016, Salazar informed Presson that it was very unlikely that they would be far enough into the green card process to allow Michael to stay in the United States on Technicolor payroll after his temporary work visa expired later that year.  This information was not, however, conveyed to Michael at the time.

7

Finally, on March 7, 2016, Presson e-mailed Michael that she did not "have good news for [him]." Michael spoke with Salazar and Presson the next day and was told that no part of his green card application had yet been filed and that it would take another 10 to 12 months to complete the process. Because his temporary work visa was set to expire soon, he would have to leave the United States for about 10 months. It was initially suggested that Michael could continue to work for Technicolor remotely from the United Kingdom during that period, but by the end of March 2016, Technicolor decided it would not employ Michael beyond the expiration of his visa on May 24, 2016. Michael's manager told him that it was "a bad time for her" as she was only "worried about . . . hitting" quarterly numbers and could not "deal[] with someone . . . not in the office."

The Reynauds were devastated by the news that Michael would no longer be employed. Faced with a lack of income and healthcare, they had no choice but to uproot their young family, sell their condominium, and return to England in June 2016. The family initially lived with Michael's parents in London, but subsequently moved to the north of England to live with Fiona's terminally ill mother. Michael's extensive efforts to obtain work in England were unsuccessful, as his business contacts were in Los Angeles.

Michael has suffered from depression, which has "taken a big toll on" his relationship with his wife and children. Fiona has woken up to find Michael crying because "[h]e feels like he can't support his family." Fiona has also sought counseling for depression and anxiety.

## PROCEDURAL BACKGROUND

The Reynauds sued Technicolor for negligence, alleging that Technicolor breached its assumed duty of due care "by failing to initiate the green card process." If not for Technicolor's breach, the Reynauds "would have obtained a green card and would not have been forced to move back to England in the face of deportation proceedings."[4]

The case was tried to a jury in March 2018. In a special verdict, the jury found that Technicolor had been negligent and that its negligence was a substantial factor in causing harm to the Reynauds. In addition, the jury found that Michael had been negligent and that his negligence had also been a substantial factor in causing harm to himself and Fiona. The jury assigned 95 percent responsibility for the Reynauds' harm to Technicolor and 5 percent to Michael.

The jury awarded Michael $317,114 in past lost wages and benefits; $570,000 in future lost wages and benefits; $1,200,000 for past mental and emotional suffering; and $600,000 for future mental and emotional suffering. Fiona was awarded $300,000 for past mental and emotional suffering; and $200,000 for future mental and emotional suffering. The trial court reduced the jury's damages awards based on the finding of Michael's comparative fault and Ogletree's prior settlement. As a result, judgment was entered in the amount of $803,838.30 for economic damages and $2,083,920 for noneconomic damages, for a total award of $2,887,758.30.

---

[4] The Reynauds also sued Ogletree for professional malpractice. That cause of action was settled prior to trial and is not at issue in this appeal.

9

The trial court subsequently denied Technicolor's motions for judgment notwithstanding the verdict and for a new trial, and this timely appeal ensued.

**DISCUSSION**

I. *Substantial Evidence Supports the Verdict*

Technicolor raises two challenges to the sufficiency of the evidence supporting the jury's verdict. First, Technicolor argues that, irrespective of any delay,[5] there is no evidence that it could have satisfied the labor verification requirement in order to submit the PERM application. Second, it argues that there is no evidence that its conduct harmed the Reynauds because they were left in the same position that they were in before Technicolor offered to sponsor Michael—without green cards. Both arguments lack merit.

A. <u>Standard of review</u>

"Where findings of fact are challenged on a civil appeal, we are bound by the 'elementary, but often over-looked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.]" (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)

"'In applying this standard of review, we "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in

---

[5]    Technicolor does not challenge the sufficiency of the evidence that it unreasonably delayed the green card process. Nor does it dispute that it assumed a duty of care toward the Reynauds.

10

its favor . . . .” [Citation.]’ [Citation.] “‘Substantial evidence” is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value.’ [Citation.] We do not reweigh evidence or reassess the credibility of witnesses. [Citation.] We are ‘not a second trier of fact.’ [Citation.]” (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245–1246.)

B. Substantial evidence that Technicolor could have satisfied the labor verification requirement

The testimony presented to the jury, and the reasonable inferences that could be drawn from that testimony, provide substantial evidence that, if Technicolor had proceeded to the advertising and recruitment stage, it would have failed to attract a minimally qualified U.S. worker for Michael’s sponsored position and, therefore, Technicolor could have satisfied the labor verification requirement.

Several witnesses involved in Michael’s green card matter testified that the objective when setting minimum requirements is to minimize the pool of qualified candidates while, at the same time, ensure that the sponsored employee’s qualifications are sufficient and can be verified. And, the stated requirements must be legitimate—that is, reflect actual hiring practices.

Technicolor and its experienced counsel at Ogletree spent months drafting and revising the minimum requirements for Michael’s sponsored job. They finally settled on 10 discrete experiential requirements that a candidate for the position was required to possess in addition to having an MBA: (1) three years “in the related occupation of Business Analyst”; (2) one year “with the analysis of competitive positioning within the Theatrical and Broadcast post-production market”; (3) one year “in finance and accounting, including complex financial modelling”; (4) three

11

years "with advanced Excel skills, including pivot tables and manipulating data"; (5) one year "with management accounting concepts and their application to post[-]production data"; (6) one year "with non-financial metrics to analyze current and future financial health of business units for accurate revenue forecasting"; (7) one year "with evolving post[-]production landscapes and workflows"; (8) three years "creating presentations and presenting them to internal and external clients and senior leadership"; (9) three years "analyzing business workflows"; and (10) one year "using ScheduAll."

Based on the goal shared by those involved at Technicolor and Ogletree to craft the minimum requirements in such a way as to minimize the applicant pool, the amount of time and effort spent determining the requirements, the number and content of the finalized requirements, and the extensive job-based immigration experience of Salazar and Ruby, the jury could logically and reasonably infer that advertising and recruiting for the position would not have produced a qualified U.S. citizen or permanent resident applicant. Therefore, more likely than not, Technicolor could have satisfied the labor verification requirement and filed the PERM application. And, based on Ruby's testimony that he had filed hundreds of PERM applications while representing Technicolor and could not recall ever having one of them denied, the jury could also rationally conclude that, if not for Technicolor's negligence, a PERM application filed for Michael would probably have been approved and he and Fiona would have, eventually, obtained green cards. This was sufficient to meet the Reynauds' burden on causation. (See *Uriell v. Regents of University of California* (2015) 234 Cal.App.4th 735, 746 ["'In *any* negligence case, the plaintiff must

12

present evidence from which a reasonable fact finder may conclude that defendant's conduct probably was a substantial factor in bringing about the harm.' [Citation.]"].)

Technicolor's various arguments to the contrary run afoul of the substantial evidence standard.

First, Technicolor rejects the suggestion that a juror could reasonably infer from the evidence that Technicolor could have satisfied the labor verification requirement. It claims that "the notion that one of the world's largest metropolitan labor markets—*where half of all domestic film and television jobs are located*—could supply no business analyst with post-production experience to an industry leader like Technicolor requires a suspension of all real-world experience and common sense." (Fn. omitted.)

"Our role is to determine the legal sufficiency of the found facts and not to second guess the reasoning or wisdom of the fact finder." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 946.) "'Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.' [Citation.]" (*Miller v. Southern Pacific Co.* (1953) 117 Cal.App.2d 492, 507, quoting *Lavender v. Kurn* (1946) 327 U.S. 645, 653.) Having identified substantial evidence in the record to support the jury's finding of causation, we are unpersuaded by Technicolor's critique of the jury's rationality.

13

Second, Technicolor asserts that the record "contains unrebutted testimony by three experts . . . that qualified U.S. workers *were* likely available to perform [Michael's] job." We do not agree with this characterization of the evidence. Although Technicolor's immigration expert, Catherine Haight (Haight), opined to this effect, the other expert witnesses referenced— Technicolor's damages expert, Jonathan Guryan (Guryan), and the Reynauds' vocational expert, Phillip Sidlow (Sidlow)—did not. Neither Guryan nor Sidlow testified about the immigration process or, more specifically, the likelihood that a U.S. citizen or permanent resident meeting the minimum requirements established for Michael's sponsored position would have applied for the job had it been advertised.

Technicolor points to Guryan's testimony that Michael's skills were "very general or transferable" and that "[t]he tasks he did in his job are the types of things that many, many businesses have people doing." Technicolor latches upon Sidlow's testimony that he located more than 10 postings for Los Angeles-based jobs on the internet "that required an MBA or looked like they required the kind of skills and background that [Michael] had." But these statements were made in the context of testifying about Michael's ability to find comparable employment for the purpose of determining damages. Furthermore, "indulg[ing] all legitimate and reasonable inferences to uphold the verdict" (*Ortega v. Pajaro Valley Unified School Dist.* (1998) 64 Cal.App.4th 1023, 1043), the jury could have interpreted the testimony of Guryan and Sidlow to mean that Michael's skills were highly sought after in the Los Angeles job market, thus potentially making it *less* likely that the sponsored job, with its

14

specific educational and experiential minimum requirements, would have drawn another qualified applicant.

Third, Technicolor contends that Haight's opinion that advertising and recruiting for Michael's sponsored position likely would have drawn a minimally qualified U.S. applicant was dispositive and could not be disregarded by the jury. Not so.

As explained by our Supreme Court, "The jury is not required to accept an expert's opinion. The final resolution of the facts at issue resides with the jury alone. The jury may conclude a fact necessary to support the opinion has not been adequately proven, even though there may be some evidence in the record tending to establish it. If an essential fact is not found proven, the jury may reject the opinion as lacking foundation. Even if all the necessary facts are found proven, the jury is free to reject the expert's opinion about them as unsound, based on faulty reasoning or analysis, or based on information the jury finds unreliable. The jury may also reject an opinion because it finds the expert lacks credibility as a witness." (*People v. Sanchez* (2016) 63 Cal.4th 665, 675.)

Given the substantial evidence we have identified, which conflicted with Haight's opinion, and her responses to questioning aimed at impeaching her credibility, the jury could properly reject her opinion.[6]

---

[6] Technicolor relies on *Krause v. Apodaca* (1960) 186 Cal.App.2d 413, but that case is factually distinguishable. In *Krause*, the Court of Appeal found the jury's verdict unsupported by substantial evidence because there was a dearth of evidence regarding the cause of a fire except for the uncontradicted opinion of two experts. (*Id.* at pp. 416–417.) Neither the qualifications nor the probity of the experts were questioned. (*Id.* at p. 417.) Under these unique circumstances, the Court of Appeal

15

Fourth, and finally, we find it irrelevant that Michael's duties at Technicolor were assumed by a U.S. worker, Jennifer Maurus (Maurus), upon his departure. Maurus did not have an MBA and therefore would not have been minimally qualified for the sponsored position had it been advertised. Technicolor argues that "[t]he bare fact that Maurus performed [Michael's] job means she was minimally qualified to do so." This is a challenge to the validity of the minimum requirements set by Technicolor with its legal counsel's guidance; it does not affect our conclusion that substantial evidence exists that the sponsored position, if advertised with those minimum requirements, likely would have failed to attract a qualified U.S. worker to apply.

C. Substantial evidence that Technicolor's negligence left the Reynauds in a worse position

Technicolor also argues that the Reynauds were left in the same position as they were before Technicolor voluntarily agreed to sponsor Michael for a green card—that is, without green cards—and, therefore, no cognizable harm exists. We disagree.

As discussed above, the conclusion that Technicolor's negligence was a substantial factor in preventing the Reynauds from obtaining green cards is supported by substantial evidence. Substantial evidence also exists that the Reynauds relied on Technicolor to act with due care and were adversely affected by Technicolor's breach of that duty.

Michael testified that he "would have planned [his] life very differently" had he known that he would not get a green card.

concluded that the experts' opinions could not be disregarded. (*Ibid.*)

16

Technicolor contends that the jury was not permitted to speculate that Michael might have obtained a green card through another employer. Assuming that is true, the jury could still reasonably infer from Michael's testimony that if Technicolor had not agreed to sponsor his green card in October 2014, or had even informed him earlier than March 2016 that time had run out on his ability to stay uninterrupted in the United States, the Reynauds could have better prepared for their eventual departure from the country. (See *Maaso v. Signer* (2012) 203 Cal.App.4th 362, 371 ["Substantial evidence includes reasonable inferences drawn from the evidence in favor of the judgment"].) Instead, the evidence presented to the jury indicated that the Reynauds were unexpectedly faced with Michael's unemployment and the need to quickly sell their home and move thousands of miles away with two young children. These are cognizable injuries.

II. *Workers' Compensation Exclusivity Is Inapplicable*

      A. <u>Relevant law</u>

Under California's Workers' Compensation Act (Lab. Code, § 3200 et seq.),[7] workers' compensation is the exclusive remedy ("in lieu of any other liability whatsoever") "for any [employee] injury . . . arising out of and in the course of the employment" where enumerated "conditions of compensation" are satisfied. (§ 3600, subd. (a); see also § 3602, subd. (a).) As relevant here, the conditions of compensation include that "at the time of the injury, the employee is performing service growing out of and incidental to his or her employment and is acting within the course of his or her employment" (§ 3600, subd. (a)(2)) and that

---

[7] All further statutory references are to the Labor Code unless otherwise indicated.

17

"the injury is proximately caused by the employment, either with or without negligence" (§ 3600, subd. (a)(3)).

"'[A]rising out of' and 'in the course of' are two separate requirements." (*Lee v. West Kern Water Dist.* (2016) 5 Cal.App.5th 606, 625; see also *Maher v. Workers' Comp. Appeals Bd.* (1983) 33 Cal.3d 729, 732–733 (*Maher*) [referring to the "two-pronged requirement" of workers' compensation].) "[F]or an injury to 'arise out of the employment' it must 'occur by reason of a condition or incident of [the] employment . . . .' [Citation.] That is, the employment and the injury must be linked in some causal fashion. [Citation.]" (*Maher*, *supra*, at pp. 733–734.) "'[I]n the course of the employment[]' . . . 'ordinarily refers to the time, place, and circumstances under which the injury occurs.' [Citation.]" (*Id.* at p. 733.) These two requirements are "often so intertwined that no valid line of demarcation can be drawn[.]" (*Scott v. Pacific Coast Borax Co.* (1956) 140 Cal.App.2d 173, 178–179.)

The Workers' Compensation Act is to be liberally construed in favor of awarding workers' compensation benefits. (§ 3202; *King v. CompPartners, Inc.* (2018) 5 Cal.5th 1039, 1051.) "The rule is not altered because a plaintiff believes that he can establish negligence on the part of his employer and brings a civil suit for damages." (*Freire v. Matson Navigation Co.* (1941) 19 Cal.2d 8, 10.)

B. Relevant proceedings

Among the affirmative defenses raised in its answer, Technicolor asserted that workers' compensation provides the exclusive remedy for the Reynauds' claims premised on emotional injury or distress. Technicolor also raised the issue of workers'

18

compensation exclusivity in a motion to strike and in a motion in limine.

The motion to strike sought to remove language from the operative first amended complaint regarding the Reynauds' alleged physical, mental, and emotional injuries on the ground that they were barred by workers' compensation exclusivity. Technicolor does not specifically challenge the denial of the motion to strike on appeal.

The motion in limine sought to exclude "irrelevant and prejudicial" evidence at trial "regarding [the Reynauds'] alleged physical, mental and emotional distress injuries."[8]  The trial court expressed its "skeptic[ism] of the reach of the workers' comp scheme to this type of fact situation."  Although "related to [Michael] being a Technicolor employee[,]" the court did not consider Technicolor's sponsorship of the green card to be "directly related to" or "inherent in" Michael's employment, and therefore denied the motion.  Technicolor challenges this ruling.

While we generally review orders on motions in limine for abuse of discretion, our review is de novo when the issue is one of law.  (*Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1277; see also *People*

_____

[8]  Although the Reynauds have not argued that they suffered any prejudice by Technicolor's procedure, it would have been more appropriate for Technicolor to raise workers' compensation exclusivity in a motion for summary adjudication.  (See *Pellegrini v. Weiss* (2008) 165 Cal.App.4th 515, 530 ["Generally speaking, in limine motions are disfavored in cases in which they are used not to determine in advance the court's projected ruling if presented with an evidentiary objection during trial, but instead to serve as a substitute for a dispositive statutory motion"].)

19

*ex rel. Alzayat v. Hebb* (2017) 18 Cal.App.5th 801, 811–812 [when the relevant facts are undisputed, whether workers' compensation exclusivity applies is a question of law].)

C. The Reynauds' injuries did not arise out of Michael's employment

Technicolor contends that the damages awarded to the Reynauds for emotional distress were barred, in part, by workers' compensation exclusivity. Specifically, it argues that Michael suffered a personal injury during his employment when "Technicolor shared its decision to halt all sponsorship efforts"; that this "occurred while [Michael] was performing his regular work and 'enjoying' visa services incident to that work"; that the risk was reasonably encompassed within the employment; and that Fiona's claims are derivative of Michael's and thus equally barred.

Technicolor cites no factually similar authority in support of its position and instead relies on readily distinguishable cases. (See, e.g., *Weber v. United Parcel Service, Inc.* (2003) 107 Cal.App.4th 801, 808–809 [holding that workers' compensation was exclusive remedy where employment posed an inherent risk of hearing loss and required, employer-provided hearing examination was negligently administered]; *Wickham v. North American Rockwell Corp.* (1970) 8 Cal.App.3d 467, 469–470, 472 [holding that workers' compensation was exclusive remedy where employment posed an inherent respiratory health hazard and employer's agent negligently took and analyzed lung x-rays during an employer-provided examination].)

Though not cited by either party, we find *DerKevorkian v. Lionbridge Technologies, Inc.* (10th Cir. 2008) 316 Fed.Appx. 727 [nonpub. opn.] (*DerKevorkian*), 2008 U.S. App. Lexis 24566 to be

20

both factually analogous and persuasive on the applicability of workers' compensation exclusivity to the Reynauds' claims.[9]

That case also involved a "dispute arising out of an [employer's] effort to obtain a permanent resident 'green card' for" a foreign employee, Isabelle DerKevorkian, in Colorado. (*DerKevorkian*, *supra*, 316 Fed.Appx. at p. 729.) Like Michael's, DerKevorkian's temporary work visa was set to expire and she needed to obtain a green card to remain in the United States. Her employer, Lionbridge, maintained a program that assisted employees applying for green cards. To participate, DerKevorkian agreed to work for Lionbridge for two years after obtaining the green card and to use an immigration attorney retained by the company. (*Ibid.*) After numerous complications arose, Lionbridge did not file an application to sponsor the green card, and DerKevorkian left the country. (*Id.* at pp. 729–732.) She claimed that she suffered mental injuries such as depression and anxiety. (*Id.* at p. 732.)

DerKevorkian sued Lionbridge. The case was ultimately tried to a jury, which returned verdicts against Lionbridge on DerKevorkian's claims for breach of contract, breach of fiduciary duty, and promissory estoppel and awarded noneconomic damages. (*DerKevorkian*, *supra*, 316 Fed.Appx. at pp. 732–733.)

---

[9] "Although we may not rely on unpublished California cases, the California Rules of Court do not prohibit citation to unpublished federal cases, which may properly be cited as persuasive, although not binding, authority. [Citations.]" (*Airline Pilots Assn. Internat. v. United Airlines, Inc.* (2014) 223 Cal.App.4th 706, 724, fn. 7; see also Cal. Rules of Court, rule 8.1115(a); Fed. Rules App.Proc., rule 32.1(a); U.S. Cir. Ct. Rules (10th Cir.), rule 32.1(A).)

"The district court rejected Lionbridge's argument that the non-economic damage award must be reduced to zero under [Colorado's] Workers' Compensation Act" because "DerKevorkian had not suffered a 'personal injury' under [Colorado's Workers' Compensation] Act, which the district court thought required bodily harm." (*Id.* at p. 733.)

As with California, under Colorado law, workers' compensation is "the exclusive remedy for personal injuries 'arising out of and in the course of the employee's employment.' [Citation.]" (*DerKevorkian*, *supra*, 316 Fed.Appx. at p. 735; see also Colo. Rev. Stat. § 8-41-301, subds. (1)(b), (2)(a).) On appeal, while the Tenth Circuit agreed with Lionbridge that DerKevorkian's depression and anxiety were the *type* of injuries that could be compensable under workers' compensation, it disagreed that workers' compensation exclusivity applied because her "injuries did not occur in the course of or arise out of her employment." (*DerKevorkian*, *supra*, at p. 735.) Rather, the court reasoned, DerKevorkian's injuries "came about because of a completely separate agreement to assist her with her green card application. While it is true that she would not have been eligible to participate in the [green card assistance program] were she not a Lionbridge employee, and it would have been mutually beneficial to both her and Lionbridge had she obtained a green card, we cannot say that her injuries occurred in connection with, or stemmed from, work-related activities or were related to her actual job function as a translator, translator manager, or any other functions she performed at Lionbridge." (*Ibid.*)

We conclude that workers' compensation exclusivity is inapplicable here for the same reasons. The Reynauds' injuries did not arise out of Michael's job-related duties or responsibilities

22

as a business analyst at Technicolor.  Michael was not "*performing service* growing out of and incidental to his . . . employment[.]"  (§ 3600, subd. (a)(2), italics added.)  The sponsorship of Michael's green card was neither a condition of employment nor a form of compensation.  Nor was Technicolor's negligent handling of the process an inherent risk of Michael's employment.

Under these circumstances, the trial court properly denied Technicolor's motion in limine, and we will not disturb the jury's damages award.

## DISPOSITION

The judgment is affirmed.  The Reynauds are entitled to costs on appeal.

**CERTIFIED FOR PUBLICATION**.


_____, Acting P. J.
ASHMANN-GERST


We concur:



_____, J.
CHAVEZ



_____, J.
HOFFSTADT